**Clara B. ALVORD, a widow, Appellant,**

v.

**TENNECO CORPORATION et al., Appellee.**

**No. 7743.**

Court of Civil Appeals of Texas.

Texarkana.

Nov. 1, 1966.

Rehearing Denied Nov. 29, 1966.

Tom Bankhead, Bankhead & Davis, Carthage, for appellant.

Patrick H. Rafferty, Rafferty, Taylor, Kepner & Associates, Houston, J. E. Jackson, Long, Strong, Jackson & Strong, Carthage, John Minton, Spruiell, Lowry, Potter, Lasater & Guinn, Murph Wilson, Wilson, Miller, Spivey & Steger, Tyler, for appellee.

DAVIS, Justice.

H. H. Alvord, Jr., was the original plaintiff in this suit. He was the successor in title of all the properties that had previously been owned by Natural Gas Production Company, Inc., hereinafter called Natural. Tenneco Corporation, et al, as defendants, were sued by H. H. Alvord, Jr., for the purpose of construing certain contracts. A summary judgment was granted in the case in favor of the defendants, and an appeal was taken to the Twelfth Court of Civil Appeals in Tyler. The Twelfth Court of Civil Appeals held there were issues of fact

as to whether or not there had been an abandonment of certain oil wells that were owned by H. H. Alvord, Jr. The judgment of the trial court was reversed and the cause remanded for a new trial. Alvord, Jr. v. Tenneco Corporation, Tex.Civ.App., 382 S.W.2d 358, W.R., N.R.E.

Sometime, during these proceedings, H. H. Alvord, Jr., died. His wife, Clara B. Alvord, a widow, was made a party plaintiff in lieu of her husband.

A second motion for summary judgment was filed by Tenneco, et al, in which they admitted that the title to the wells had not been abandoned. It is interesting to note that in an agreement entered into between Midstates and Natural (Midstates being the prior title holder from whom Tenneco Corporation acquired interest in the contracts) did on the 14th day of June, 1947, release the right to purchase from Natural (Alvord) the wells that had been producing oil upon the property described in the lease contracts.

Tenneco, et al, filed a second motion for summary judgment after they had admitted that the 8 oil wells had not been abandoned. The trial court granted the summary judgment. Mrs. Alvord has perfected her appeal, and brings forward 7 points of error.

### HISTORY

We will try to give the history of the contracts that are involved. Natural was the owner of certain oil and gas leases that were situated in Harrison County, Texas, and Panola County, Texas. The leases involved in this suit were the ones situated in Panola County, Texas. They were executed in 1923, 1928, 1929 and *1949*. On the 7th day of March, *1941*, Natural entered into an agreement with Midstates effecting an interest in the oil, gas and mineral leasehold estates whereby Midstates was to commence drilling a well down to a depth of 6500 feet, but *below 4700 feet from the surface*. The contract dated March 7, 1941,

contains the following provisions: It provides that Natural desires to sell *certain rights* in each of said leases. It further provides that Natural does: "Grant, sell, transfer and assign *all* of the right, title and interest of the original lessee and present owner in and to each of said leases, excepting said overriding royalty reserved to Ohio Oil Company under said Bryson leases, unto Midstates, its successors and assigns, subject, to the *reservations* and *conditions* hereinafter provided: * * *." Emphasis added. The contract further reserves to Natural the right to any causes of action which Natural may have and the *title* to 8 certain wells producing on the leases. The contract gave the depth of each well that was producing down to a depth of 4704 feet. It provided that Midstates could not produce from either of the horizons from which the 8 wells were producing. *Title* to each of the wells was reserved with an option for Midstates to purchase them. Midstates later released this right. Natural reserves certain overriding royalties and provided that there would be no overriding royalty on wells that were drilled below a depth of 6500 feet. The contract carries this provision:

"* * * In the event Midstates elects to commence the drilling of a well as herein provided, it shall proceed with such drilling with reasonable diligence to the horizon from which the Holcomb and Thomason well #15 Crenshaw is now producing or to a depth of six thousand five hundred (6,500) feet, whichever shall be first encountered, unless production is obtained at lessor depths and *below the four thousand seven hundred (4,700) foot horizon*." (Emphasis added.)

The contract provides that:

"* * * Natural shall cause to be unitized said Roquemore leases into one lease with respect to all horizons below

four thousand seven hundred four (4,-704) feet, * * *."

Section 13 of the contract reads as follows:

"Natural shall pay gross production tax, *ad valorem tax and any other tax assessed* against Natural upon its *proportionate interest* when such taxes are assessed or become due."

In the agreement and release that was entered into between Alvord, successor to Natural, and Midstates, on June 14, 1947, contains the following language:

"NOW, THEREFORE, for and in consideration of the premises and of the mutual covenants and agreements herein provided to be kept and performed Alvord, Midstates and United mutually and severally agree each with the other that the said above described gas purchase contracts and all amendments and supplements thereto, whether such amendments and supplements are described and listed above or not, shall be and they are hereby in all things cancelled, terminated, discharged and declared null and void as of July 26, 1947, and the parties hereto shall be and are hereby released as of said date of and from any and all rights and privileges, liabilities and obligations thereunder; provided, however, that nothing in this instrument contained shall have effect to release or cancel the rights of Midstates and Alvord in that certain gas purchase contract described in paragraph (b) hereinabove in so far as it covers all depths *below four thousand seven hundred four (4704) feet subsurface. For the same consideration Midstates does hereby release, discharge and relinquish any and all rights*, if any, which it owns or might assert in said gas purchase contract described in paragraph (b) together with all amendments and supplements thereto, whether such amendments and supplements are described and listed in said paragraph or not, *down to a depth of four thousand seven hundred four (4704) feet*, and in said gas purchase contract described in paragraph (a) together with all amendments and supplements thereto, whether such amendments and supplements are listed and described in said paragraph or not, *together with any and all rights and options which it might have for the purchase and transfer from Alvord of any and all wells now situated on and producing from any properties covered by said gas purchase contracts released by this instrument as is provided for in that certain contract between Natural Gas Production Company, Inc. and Midstates dated the 7th day of March, 1941*, recorded in Volume 136, Page 435 of the Deed Records of Panola County, Texas, and that certain transfer and assignment from Natural Gas Production Company, Inc. to Midstates Oil Corporation, dated April 24, 1941, recorded in Volume 137, Page 187, Deed Records, Panola County, Texas, and Volume 245, Page 261 et seq. Records of Harrison County, Texas, to which reference is made. * * *." Emphasis added.

In a contract and agreement between Midstates and United Gas Pipeline Company, entered into on October 23, 1943, the contract says: " * * * Midstates is the present owner of an oil and gas leasehold, insofar as said leasehold covers and applies to all horizons *below a depth of 4704 feet subsurface. * * *.*" Emphasis added. This contract and agreement refers to the contract and agreement entered into between Natural and Midstates on April 7, 1941.

Alvord alleged in the original petition that all rights acquired by Midstates under the contract of March 7, 1941, was to drill certain wells at a depth below 4700 feet from the surface. He further alleged that wells had been drilled to a depth above 4704 feet by virtue of certain other contracts that had been entered into between Midstates and others and that he had been fraudulently deprived of the value of the production therefrom. He further alleged that all of the contracts were ambiguous

and uncertain in the language adopted concerning the rights and interest reserved by Natural in said shallow rights and the interest and rights acquired by Midstates in said shallow rights. He further alleged that because of the uncertainty and ambiguity in the contracts he was entitled to show by extrinsic evidence the surrounding circumstances and true intent of the parties. He further alleged that he did show that under the agreement that the true intent of the parties was that the shallow rights were retained by Natural and that Midstates only acquired and claimed the title or interest below the depth of 4704 feet from the surface.

Tenneco, et al, takes the position that the contracts were not ambiguous and can be construed as a matter of law.

Alvord alleged in his reply and affidavit to the motion for a summary judgment that he was the owner of the shallow lease rights down to a depth of 4704 feet and that Midstates had only acquired the deeper leasehold interest in and to the leases.

Alvord, taking the position that the contracts were ambiguous, offered in evidence by the deposition of F. H. Harrell, a former officer in Midstates, who testified that he knew of the contract that was entered into between Natural and Midstates and that Midstates did not at any time claim any interest in the leasehold estates above a depth of 4704 feet. He testified positively that Midstates did not acquire any interest above the 4704 feet, but only acquired the interest below that depth.

On April 24, 1941, an assignment was entered into between Natural and Midstates which adopted an "unrecorded agreement". Apparently, the unrecorded agreement was dated prior to March 7, 1941, and probably does not pertain to the issues involved in this suit. The writer has made a careful search of the record for the "unrecorded agreement", but is unable to find the same.

This court is supposed to construe all of these contracts together, if possible. We have tried to do so in view of the points of error that have been raised.

By her first 5 points of error, Mrs. Alvord says the trial court erred in the judgment he entered because: he denied her the shallow rights of the leasehold estate in controversy; in adjudging her right to enter upon the leasehold to be for the sole purpose of operating and reworking the wells that were producing on March 7, 1941; that she had no right to deepen her wells or produce from any other formation other than those from which they were being produced on March 7, 1941; that she did not have the right to drill any new wells on any location on the leased premises; and that the contracts are ambiguous.

In trying to interpret the contracts that are involved, we have decided that the contracts are ambiguous (doubtful in meaning) and that the plaintiff should be entitled to offer extrinsic evidence to show the true intent of the parties at all times during the entire life of the contracts. When a contract, or contracts, is/are unambiguous, they must be construed as a whole in the light most favorable to the grantee. This has always been the law. Anderson & Kerr Drilling Company v. Bruhlmeyer (1940), 134 Tex. 574, 136 S.W.2d 800, 127 A.L.R. 1217.

In trying to make up our mind as to whether the contracts are ambiguous, or not, many cases have been read and much law has been studied. We even referred to Webster's Dictionary, which gives the meaning of ambiguous as follows:

"Having two or more meanings; doubtful; being of uncertain signification; susceptible of different interpretations; hence, obscure. It is applied to words and expressions; not to a dubious state of mind, though it may be to a person using words of doubtful signification; as, the ancient oracles were ambiguous.

"Syn: Doubtful, indefinite, dubious, equivocal, uncertain, involved."

As we view the contracts, it seems that Natural (Alvord) did not reserve unto himself in the contract dated March 7, 1941, to anything but the title to the existing oil wells. But, other reservations were made and excepted from the conveyance. The contract further provided that Midstates may drill a well to 6500 feet, but below 4700 feet. It seems that the contract that was entered into on June 14, 1947, settled the issue as to who owned the shallow mineral rights down to a depth of 4704 feet, because Midstates thereby released all of its rights above 4704 feet. Also it relinquished its right to buy the wells, if abandoned. Then the contract that was entered into on October 23, 1943, between Midstates and United Gas Pipeline Company, creates more doubt as to the intent of all the parties. We hold that there are material questions of fact as to who owns the leasehold estate above 4704 feet, and that the contracts are ambiguous. Smith v. Allison, 1956, 157 Tex. 220, 301 S.W.2d 608. The points are sustained.

If the material fact issues hereinbefore stated are decided against the appellees, the 6th point of error will be decided. Although she is complaining that a predecessor in title, Midstates, had already relinquished to her any and all rights to the lease in question down to a depth of 4704 feet. In construing the release, it seems that this is true that they did release all the rights that they had in the leases down to that depth. The point is sustained.

By her 7th point of error, Mrs. Alvord says the trial court erred in taxing "all costs" in this cause against her, especially upon the prior appeal and the mandate from the Court of Civil Appeals in Tyler. With this we agree. The trial court should not have taxed the cost of that appeal against Mrs. Alvord.

The judgment of the trial court is reversed and remanded, and all cost of this appeal is taxed against the appellees.