**TENNECO OIL COMPANY et al.,**
**Petitioners,**

v.

**H. H. ALVORD, Jr., Respondent.**

**No. B–31.**

Supreme Court of Texas.

May 31, 1967.

Rehearing Denied June 28, 1967.

Long, Strong, Jackson & Strong, Carthage, Rafferty, Taylor, Kepner & Associates, Houston, Wilson, Miller, Spivey & Steger, Murph Wilson, Spruiell, Lowry, Potter, Lasater & Guinn, John H. Minton, Jr., Tyler, for petitioners.

Bankhead & Davis, Tom Bankhead, Carthage, for respondent.

GREENHILL, Justice.

The question here is whether certain oil and gas instruments reserved to the grantor the mineral estate to a depth of 4704 feet. The trial court entered a summary judgment that such estate was not reserved. The Court of Civil Appeals reversed that judgment and remanded the cause for a trial on the ground that the various instruments in question were ambiguous and hence parol evidence was admissible to ascertain the intentions of the parties. Tex.Civ.App., 408 S.W.2d 769. We granted a writ of error to review that holding.

The eight oil and gas leases in question were owned by Natural Gas Production Company, hereinafter called Natural. It had sixteen oil or gas wells on the leases in Harrison and Panola Counties. The shallowest production was of gas at 900 feet on the Floyd lease. There were other producers of oil or gas between 2300 and 2500 feet. The deepest well was bottomed at 4704 feet on the Roquemore lease.

On March 7, 1941, Natural and Midstates Oil Corporation entered into a contract whereby Natural agreed to assign to Midstates major interests in the above leases.

It was contemplated that Midstates would test the lower strata, and Natural would receive an overriding royalty from such production. The contract to assign resulted in an assignment dated April 24, 1941. The question is whether Natural, in such contract and assignment, reserved the entire mineral estates in all the leases down to 4704 feet, or whether it reserved only the then existing wells on the leases, together with the right to produce from such wells, to rework them, and other incidental rights restricted to the particular wells.

Natural subsequently assigned its rights to H. H. Alvord, Jr., who had been Natural's president. Midstates assigned its interests to Tenneco. Tenneco, in turn, farmed out the Floyd lease down to 3850 feet, or to the base of the Mooringsport Lime, to J. S. Meriwether et al. who obtained production. As mentioned above, Natural had one well on the Floyd lease producing at 900 feet.

Alvord brought this suit against Tenneco for a declaratory judgment. He sought a declaration that his predecessor, Natural, had reserved the mineral estate down to 4704 feet. Meriwether et al. intervened and aligned themselves with Tenneco.

The contract whereby Natural [Alvord] agreed to assign the leases to Midstates [Tenneco] will be discussed below. One of its provisions, however, was that "title to each of the [16] wells * * * shall not pass * * * to Midstates," and that Natural would have the right to produce such wells from the horizon from which they were producing "until Natural elects to *abandon* the same * * *." [All emphasis herein is ours.]

Upon the first trial of this case, the court entered a summary judgment for Tenneco and the intervenors. The holding was that they owned the entire mineral estates (including that above 4704 feet) subject to

certain overriding royalties not in question here. The court also, by summary judgment, held that Natural [Alvord] had abandoned all of the sixteen wells, and hence their rights in the shallow production had ceased.

Upon the first appeal, the Court of Civil Appeals at Tyler was of the opinion that there was an issue of fact as to whether there had been an abandonment of the wells. It remanded the cause for a trial of that fact issue. 382 S.W.2d 358 (1964). That opinion does not mention any question of ambiguity of the written instruments. Only Tenneco filed an application for writ of error, and the only point in the application was that the Court of Civil Appeals had erred in holding that there was an issue of fact as to abandonment. The application was refused, no reversible error.

Before the second trial, Tenneco and the intervenors stipulated that there had not been an abandonment of the wells, thus taking out the fact issue found by the Court of Civil Appeals. They again moved for summary judgment. Alvord contended, however, that oral evidence should be introduced to show the intention of the parties that Natural [Alvord] intended to reserve the minerals above 4704 feet, and that the true meaning of the instruments was that this estate had been reserved.[1] The trial court again entered summary judgment for Tenneco and the intervenors, holding that the instruments were not ambiguous and that Natural [Alvord] had reserved only the particular wells and the rights therein; and that the entire mineral estate had been assigned by Natural [Alvord] to Midstates [Tenneco], subject to overriding royalties not here involved.

The Court of Civil Appeals at Texarkana, on the second appeal, was of the view that, taken as a whole, the instruments were ambiguous; and it reversed the case again for a trial at which extrinsic evidence

1. Before the entry of judgment on the second trial Alvord died, and his widow was substituted as the plaintiff. The plaintiff is referred to herein as Alvord throughout.

would be introduced to show the intention of the parties. No particular provisions were stated to be ambiguous; and Alvord's counsel points out none. We are pointed to no provisions which specifically conflict with other provisions. The argument is that from several different provisions, none ambiguous in themselves, a doubt is raised as to the meaning and intention of the entire contract and assignment. It will be necessary, therefore, to summarize or set out the various provisions referred to.

The actual assignment in the case is that of April 24, 1941. After describing the leases, it states that Natural [Alvord] "does hereby grant, sell, assign and transfer unto Midstates Oil Corporation * * * its successors and assigns [Tenneco], *all* of the right, title and interest of the original lessee and present owner in and to each of the above described oil and gas leases * * *." It then refers to "a certain unrecorded agreement of even date between the same parties" and to the basic agreement between the parties of March 7, 1941, and provides that the assignment is subject to the reservations and stipulations therein contained. The "unrecorded instrument of even date" (March 7, 1941) was included in an appendix to the application for writ of error in this cause on the first appeal. Alvord's counsel does not contend that anything in that instrument creates any ambiguity. So we turn to the contract of March 7, 1941.

That contract, after describing the leases and prescribing the usual terms for furnishing and examining abstracts, contains these provisions, most of which are summarized for brevity:

(2) Upon approval of title by Midstates, "Natural shall * * * grant, sell, transfer and assign *all* of the right, title and interest" it has in all of the leases, subject to certain overriding royalties.

(3) Natural will assign to Midstates its gas purchase contracts, with certain specified exceptions.

(4) The sixteen producing wells are described as to location by leases and the depth from which they were producing. The deepest was the gas well at 4704 feet on the Roquemore lease. The instrument then sets out the language which is important here:

"Title to each of the wells presently producing and listed above shall remain in NATURAL and shall not pass under this agreement to MIDSTATES, and the equipment and appurtenances and all present and future production from said wells, together with the right to sell such production under the existing gas purchase contracts applicable thereto, shall belong to NATURAL so long as said wells continue to produce from the horizon from which said wells are presently producing and until NATURAL elects to abandon same as hereinafter provided."

(5) Natural reserved an overriding royalty of $\frac{1}{16}$ of $\frac{7}{8}$ of oil, gas or hydrocarbons "produced, saved and marketed from each of said leases * * *."

ride would never be more than $\frac{1}{16}$ of $\frac{7}{8}$

(6) Natural's overriding royalty was to be increased to $\frac{1}{8}$ of $\frac{7}{8}$ after Midstates recovered certain costs; but Natural's over- on wells producing below 6500 feet.

(7) Midstates was not obligated to drill; but if it did not begin a well within 30 days after the assignment, it was to pay Natural $100 for the privilege of delaying another 30 days. This could continue for 24 months. If Midstates had not then drilled, it agreed to reassign to Natural. If Midstates did drill, it agreed to drill to a particular horizon or 6500 feet, whichever was first encountered, "unless production is obtained at lesser depth and below the 4,700 foot horizon." It was provided that the completion of one well as a producer or as a dry hole "shall constitute full development hereunder, and MIDSTATES may retain *all of said leases* without further development * * *." [Midstates did drill and complete a well below 4700 feet.]

(8) The interest of NATURAL was subject to a deed of trust in favor of a Shreveport bank. Natural agreed to obtain from the bank a subordination of its rights to the rights of MIDSTATES, "except that the rights of MIDSTATES shall be subordinated to the rights of the bank with respect to the wells which are presently producing * * *." The instrument then continues:

"Midstates will not produce from any horizon on any particular lease from which NATURAL is now producing so long as such production by NATURAL shall continue without the consent of NATURAL unless Midstates shall fail to obtain paying production in other horizons above 6,500 feet, * * * PROVIDED that if said bank should refuse to consent to the completion of any well by MIDSTATES *in any such horizon,* MIDSTATES shall have the right to take over said loan from said bank."

(9) If Natural desired "to abandon any well presently producing on any of said leases," it was to give Midstates 30 days' notice. Midstates could then elect to acquiesce in the abandonment or "take over such well." If Midstates took over a well, it would pay Natural its salvage value, "and MIDSTATES may redrill or deepen said well, in its discretion, it being agreed that NATURAL reserves no overriding royalty on the production from any such wells derived from horizons from which the well is producing at the time MIDSTATES takes same over. MIDSTATES shall be obligated to pay overriding royalties only on the production from such wells derived from deeper horizons."

(11) Natural agreed to cause the two leases on the Roquemore tracts to be unitized into one lease with respect to all horizons below 4704 feet before the assignments were made; and (12) Midstates could unitize "any or all part of said leases with each other or other leases" as it desired.

We do not regard the assignment, or the contract to assign, as being ambiguous.

The assignment itself is plain enough; it conveys *all* of Natural's rights, title and interest subject [as far as relevant here] to the reservations and conditions of the contract to assign. It does not purport to retain any portion of the mineral estate.

Similarly, the contract to assign agrees to convey *all* of Natural's rights and reserves only sixteen [16] producing wells and rights therein. As stated, one of these wells produced from 900 feet, five from approximately 2500 feet, others at 2350, 2300, 2400, 3500, and 3750 feet. Only one well on one of the eight leases produced from 4704 feet. It was agreed that each well could continue to produce from the horizon from which it was then producing.

"A grantor may reserve unto himself mineral rights, and he may also reserve royalties, bonuses and rentals—either one, more or all." Benge v. Scharbauer, 152 Tex. 447, 259 S.W.2d 166 (1953). In Collier v. Caraway, 140 S.W.2d 910 (Tex.Civ. App. 140, writ refused), the grantor conveyed land, making this brief reservation: "The privilege to drill an oil well is hereby reserved unto the grantors, upon the hereinabove described tract of land." The grantor contended that the reservation constituted a reservation of the mineral estate. In the alternative, it was contended, among other things, that the reservation was ambiguous and that the court should admit parol evidence to show the intention of the parties. As applicable here, the holding was that grantor reserved only the right or privilege to drill a well on the land. He did not reserve an estate in land. "Ownership of the oil estate was not essential to the exercise of the right reserved to drill an oil well." The court also applied the rule that a conveyance will be construed favorably to the grantee, and it would not enlarge the reservation to grantor unless a fair construction of the language of the deed required it. The cause was not reversed to permit the grantor to introduce parol evidence.

We regard the above holdings to be applicable here. The grantor (assignor) could have reserved the mineral estate above a certain level, but it did not. Natural conveyed all of the mineral estate reserving only the right to operate and produce from specified wells provided each continued to produce from its own horizon and was not abandoned. These reservations are not ambiguous.

Counsel for Alvord seek to distinguish the *Collier* case this way: the grantor in Collier reserved the *right to drill a well* (which was construed to be an equitable right), whereas the grantor here reserved the *title to the sixteen wells* until they were abandoned. As it relates to the question of ambiguity and the reservation of the title to the mineral estate, we regard this as a distinction without a difference. The parties could agree that a well belonged to one of them and that all minerals produced from that hole would belong to the owner thereof without that person owning all of the minerals in the land down to the depth of that well.

The agreement of Midstates not to produce from 4700 feet or above with certain exceptions contained in section 8 of the contract to assign is a provision for the benefit of the Shreveport bank which held a deed of trust on the interests of Natural. The agreement was designed to protect Natural's production in those areas which would be used to repay the Shreveport bank. It was provided, however, that if the bank did not agree to Midstates' drilling in the shallow area, Midstates could take over the bank's loan, and thereby Midstates would be relieved of this part of the agreement. The paragraph does not create an ambiguity as to the title to the mineral estate.

It is argued, in substance, that a circumstance showing a reservation of the mineral estate is found in the language dealing with the various producing "horizons" of the sixteen wells; and that a "horizon" encompasses a geological structure, which means the mineral estate. The instrument did not attempt to reserve a producing horizon or formation. It limited the particular wells retained by Natural to their production at particular depths within the same producing horizon.

The agreement of Natural to unitize its two Roquemore leases above 4704 feet before the actual assignment was executed, which agreement was a condition to Midstates' obligation to take the assignment, is not inconsistent with the conveyance of the entire mineral estate to Midstates. The fact that part of the mineral estate was unitized, or was not unitized, would form no barrier for the passage of title to the mineral estate. Midstates apparently wanted these two leases unitized by Natural before it took the assignment.

It is argued that some of the provisions of section 9 of the contract to assign set out above creates a doubt as to ownership of the mineral estates. Under that section, if Natural abandoned any well, Midstates was authorized to rework, redrill or deepen such well. It is reasoned that if Midstates acquired the mineral estate above 4704 feet, it would not need Natural's authorization to redrill or deepen the well. The function of that section, taken in context, is to provide for Natural's right to overriding royalties. If Midstates did deepen the well to a different producing horizon, it was provided that Natural would receive an overriding royalty from such well. But if Midstates produced minerals from such well from the same horizon, it would not have to pay Natural overriding royalty on the well abandoned by Natural.

It is contended by Alvord that recitations in instruments executed in 1943 and 1947 created ambiguities in the 1941 contract to assign and in the 1941 assignment. Assuming that it is possible for an instrument executed years later to create an ambiguity in the original instrument, the point is not well taken. In 1943, Midstates entered into a gas purchase contract with United Gas Pipe Line Company for the sale of gas from a unit with which it had pooled the

leasehold below 4704 feet. The first recital in the contract begins, "Whereas Midstates is the present owner of an oil and gas leasehold, *insofar as said leasehold covers and applies to all horizons below a depth of 4704 feet subsurface * * *.*" The Court of Civil Appeals stated that this recitation created a doubt as to the intention of the parties to the 1941 contract. We disagree. The parties were dealing with gas produced below 4704 feet; and a recitation that one of the parties owned such rights is not, in context, to be taken as a declaration that such party does not own other rights.

In 1947 there was an agreement between United Gas Pipe Line Company, Midstates, and Alvord to release certain gas purchase contracts. The Court of Civil Appeals says this contract "settled the issue as to who owned the shallow mineral rights down to a depth of 4704 feet because Midstates thereby released all of its rights above 4704 feet." 408 S.W.2d at 773. We disagree. The only provisions of the 1947 contract which purport to release any rights of Midstates above 4704 feet are as follows:

"* * * For the same consideration *Midstates does hereby release, discharge and relinquish any and all rights, if any, which it owns or might assert in said gas purchase contract* described in paragraph (b) * * * down to a depth of four thousand seven hundred four (4,-704) feet * * * *together with any and all rights and options which it might have for the purchase and transfer from Alvord of any and all wells now situated on and producing from any properties covered by said gas purchase contracts* * * *."

The quoted language quite obviously does not release a *leasehold estate*; it releases only rights, if any, in a gas purchase contract under the terms of which the gas produced was sold to United Gas and an option which Midstates had under the terms

of a 1941 contract to obtain certain wells from Natural [Alvord].

 The assignment of April 1941 which embodies the conditions and reservations of the contract to assign of March 1941 is so worded that it can be given a certain or definite legal meaning. Its terms are expressed without uncertainty. It is not ambiguous. Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951); Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977 (1941), and Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 127 A.L.R. 1217 (1940). The trial court therefore was correct in entering a summary judgment for Tenneco and the intervenors.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

HAMILTON, J., not sitting.