N. H. READ, Appellant,

v.

B. M. BRITAIN et al., Appellees.

No. 7695.

Court of Civil Appeals of Texas.

Amarillo.

April 3, 1967.

Rehearing Denied May 1, 1967.

Lom Moser, E. H. Foster, Kolander & Templeton and R. L. Templeton, Amarillo, for appellant.

Culton, Morgan, Britain & White, Amarillo, L. A. White and Ray W. Richards, Amarillo, of counsel, for appellees.

DENTON, Chief Justice.

This suit involves the construction of an oil and casinghead gas lease. This suit, brought by N. H. Read against B. M. Britain and David Kritser, seeks to recover from the defendants gas royalties he contends are due under the lease covering certain land in Gray County, Texas. The trial court granted the defendants a partial summary judgment as to the plaintiff's cause of action under one section of the lease, and subsequently submitted the remainder of the case to the jury. The court thereafter sustained the defendant's motion for judgment non obstante veredicto and entered final judgment denying the plaintiff any recovery.

Read as lessor and G. L. Knight as lessee executed the oil and casinghead gas lease on August 8, 1962 for a primary term of one year and as long thereafter as oil or casinghead gas was produced in paying quantities. This lease was subsequently assigned by Knight to the defendants Britain and Kritser. Oil and casinghead gas were produced in paying quantities within the primary term and production has continued to the present time. The principal question is whether or not the defendants as lessees have properly accounted to plaintiff under the gas royalty clauses of the lease. It is conceded the lessees have timely paid the oil royalty provided for in section 3(a) of the lease.

The material facts are largely undisputed. B. M. Britain, one of the defendants and a practicing attorney, prepared the lease at Read's request. The three gas royalty clauses of the lease were given to Britain by Read and they were inserted into the lease at Read's request. Britain testified he copied these provisions verbatim into the lease. Knight, the original lessee assigned it to Britain and Kritser on October 2, 1962. Shortly thereafter drilling operations were commenced and oil and casinghead gas production was secured. A total of nine producing wells have been drilled on the leased premises. After production was secured the defendants began negotiating with various companies in the area to sell the gas. Dorchester Gas Producing Company subsequently agreed to purchase the gas from the defendants contingent upon Dorchester being able to resell the certain components of the casinghead gas to Northern Natural Gas Company. With this accomplished, the defendants and Dorchester entered into a casinghead gas purchase contract on April 26, 1963, at a price of 10¢ per m. c. f. The contract was for a period of five years, renewable thereafter from year to year in the absence of a notice to terminate by either party. A 1¢ m. c. f. increase was provided for at the beginning of each five-year period.

There is no dispute concerning how the casinghead gas was handled or how it was processed. The defendants installed a conventional separator on their lease. Oil from their wells goes into the separator where the casinghead gas is separated from the oil. The gas is then moved to a Dorchester compressor, through a meter and then into a transmission line owned by Northern Natural Gas Company which crosses the Read lease. The defendants

delivered the casinghead gas to Dorchester at the compressor and were paid 10¢ per m. c. f. Dorchester then delivered the gas to Northern into the latter's lines on the Read premises. Northern paid Dorchester 12¢ per m. c. f. for this gas. The gas then became co-mingled with other gas in Northern's line from gas wells in the area which was being moved to Dorchester's gasoline plant some ten miles from the Read lease. When Dorchester contracted to sell to Northern the gas purchased from the defendants, Dorchester reserved the right to purchase from Northern at the inlet of its gasoline plant, a volume of gas in Northern's line equal to that sold by Dorchester to Northern. In other words, Dorchester sold the defendants' gas to Northern and repurchased the same volume of gas from Northern and ran this amount through its plant and extracted therefrom certain liquid hydrocarbon elements from the gas and retained the extracted hydrocarbon elements. Dorchester then sold the residue, estimated to be approximately 90% in volume, of the gas purchased at the plant inlet back to Northern at the processing plant outlet for the same price of 12¢ per m. c. f. Dorchester extracted and retained such hydrocarbons as propane, butane and natural gasoline.

As stated, the primary question is whether or not the defendants have properly accounted for and paid the lessor the gas royalties provided for under the lease. This question turns upon the interpretation of the applicable lease provisions. The material clauses of the lease are:

"(b) Except where casinghead gas is processed or used as provided for in subparagraph (c) below, Lessee agrees and covenants that before any gas containing liquid hydrocarbons recoverable in commercial quantities, produced on the land, is sold, or used, it shall be run through an adequate separator of conventional type, or other equipment at least as efficient, and that all liquid hydrocarbons recoverable from the gas by such means shall be recovered. As a royalty, Lessee shall

pay, or cause to be paid, during the term hereof, three-sixteenths (3/16) of the value of such liquid hydrocarbons actually recovered, or an equivalent fraction of that amount which accrues to the Lessee, whichever is the greater.

"(c) The Lessee shall pay, or cause to be paid, during the term hereof, as royalty on casinghead gas sold or used for the manufacture of motor fuel, natural gasoline, butane, propane, and/or other liquid hydrocarbon products, or for the manufacture of sulphur and/or any other solid or non-liquid products (hereinafter referred to in this subparagraph as 'products'), whether such be by casinghead gas plant, or fractionating, absorption, or any other process except as set out in subparagraph (b) above (1) three sixteenths (3/16) of thirty-three and one-third per cent (33-1/3%) of the value of the aforesaid products of said gas actually recovered at the plant, or (2) three-sixteenths (3/16) of the value of the same which accrues to the Lessee, or (3) three-sixteenths (3/16) of the total consideration which accrues to the Lessee, whether directly or indirectly, whichever is the greatest. The basis for valuing the aforesaid products shall be the average selling price of the respective grades therefor f. o. b. at the plant in which casinghead gas is used, for the month in which such gas was delivered; providing that the prices shall not be less than the average prices quoted in two of the leading trade journals of the industry for similar grades of the aforesaid products in the territory.

"(d) In addition to any royalties provided for in paragraphs above the Lessee shall pay, or cause to be paid, during the term hereof, as a royalty on residue gas sold or used for any purpose, except when used as hereinafter provided, three-sixteenths (3/16) of the value of such gas sold or used, but in no event shall the royalty be based on an amount less than the gross proceeds of the sale thereof, or the highest price paid for residue

gas in the area, or that amount which accrues to the producer or processor, whichever is the greatest, and in no event shall this value be computed at less than seven (7¢) cents per thousand cubic feet."

■ All parties seem to agree there is no ambiguity in the provisions of the lease under consideration, even though their respective interpretations of the gas royalty clauses reach a different result. This in itself does not render the lease ambiguous. In interpreting the lease it is the duty of the court to seek the intentions of the parties. 42 Tex.Jur.2d 344, Oil & Gas, Section 163. The intention of the parties, as expressed in the lease, is to be ascertained by the consideration of all provisions of the lease, and by harmonizing, if possible, those provisions which may appear to be in conflict. McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341. Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617. These three royalty clauses must be construed together as they relate to each other. By pleadings and brief appellant has abandoned any claim for royalties under 3(b). Lessees have admittedly installed a separator and accounted for and fully paid all royalties due under that clause by paying the 3/16 of the value of the casinghead gas sold to Dorchester at the outlet of the separator. The question then is whether the lessor is entitled to gas royalties under either 3(c) or 3(d) or both, in addition to casinghead gas royalties being received under 3(b).

■ The trial court granted a partial summary judgment which held the lessees were not obligated to pay gas royalties under 3(c). This action constitutes the first group of appellant's points of error. Appellant, by pleadings and brief, contends the defendants are obligated to pay royalty on the casinghead gas under 3(c) for the reason it was sold by the defendants to Dorchester "for the manufacture of motor fuel, natural gasoline, butane, propane, and/or other liquid hydrocarbon products"; and that this obligation was imposed upon the defendants regardless of the fact the defendants were not the processors of the gas. Their position is there are genuine issues of material facts; and that therefore the defendants are not entitled to a summary judgment as to section 3(c). Appellant contends such genuine issues of material fact are: a proper interpretation and application of the casinghead gas contract between the defendants and Dorchester; whether the casinghead gas was sold or used for the manufacture of motor fuel, etc.; what Dorchester did with the gas and how it was processed; and others that need not be mentioned. These alleged fact issues are not in dispute. An interpretation of an unambiguous contract is a question of law rather than of fact. We therefore must interpret the royalty provisions in accordance with the general rules previously mentioned and determine the intentions of the parties from the lease itself. Skelly v. Archer, 163 Tex. 336, 356 S.W.2d 774.

■ Section 3(c) must be considered in connection with Section 3(b). Both sections deal with casinghead gas. It is conceded the defendants are complying with 3(b) in all respects. Section 3(b) provides "except where casinghead gas is processed or used as provided for in subparagraph (c) below; Lessee agrees and covenants * * *." Defendants have installed and are using an adequate separator to separate the oil and casinghead gas produced from the lease and are paying lessor "3/16 of the value of such liquid hydrocarbons actually recovered" in accordance with 3(b). Section 3(c) also makes reference to 3(b). It provides "the Lessee shall pay * * * as royalty on casinghead gas sold or used for the manufacture of motor fuel, natural gasoline, butane, propane and/or other liquid hydrocarbon products * * * whether such be by casinghead gas plant, or fractionating, absorption, or any other process *except as set out in subparagraph (b) above.*" (Emphasis added). They clearly differentiate how the lessee may deal with the production from the lease. Both sections 3(b) and 3(c) eliminates its applica-

tion if the other subparagraph is applied. It was not the intention of the parties that the lessee would deal with the casinghead gas under both subparagraphs. If lessee sold or used the casinghead gas, they were obligated to do one of two things under 3(b) and 3(c). They could install a separator, run the produced oil through the separator, and pay lessor 3/16 of the value of the casinghead gas "actually recovered"; or the lessees could sell or use the casinghead gas for the manufacture of products from the gas in which case a different royalty would be payable to lessor under 3(c). The lessees are not required to comply with both provisions, nor is the lessor entitled to gas royalties under both sections. These two sections are in the nature of alternative provisions.

■ By the grant in the lease ownership and title to all the gas produced from the land passed to appellees as lessee. Stephens County v. Mid-Kansas Oil & Gas Company, 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; Tidewater Associated Oil Co. v. Clemens (Tex.Civ.App.) 123 S.W.2d 780. The agreement to pay gas royalties provided for in the lease is a personal obligation on the part of the lessee to pay a specific fractional part of the casinghead gas recovered which had already been conveyed to lessees. Reynolds v. McMan Oil & Gas Company (Tex.Comm.App.) 11 S.W.2d 778; Tidewater Associated Oil Co. v. Clemens (supra). By complying with the provisions of section 3(b) lessees cannot be required to also comply with section 3(c). Lessees did not process the casinghead gas nor were they required under the lease to do so. Neither can it be said the lessees had control of Dorchester's use of such gas. Lessees chose to handle the production under the lease in accordance with 3(b). Their compliance with this section is not disputed. The trial court correctly entered a partial judgment and held under this record the lessor was not entitled to gas royalties under section 3(c) of the lease.

■ We next turn to lessor's gas royalty rights under section 3(d). The trial court submitted one special issue, to-wit: "What was the highest price paid for residue gas in the area on January 1, 1964?" The jury found such price to be 13¢ m. c. f. The trial court granted the defendants' motion for judgment non obstante veredicto as to lessor's right of recovery of royalties under this section. We therefore have a law question to determine lessor's rights under this section. This clause will be interpreted in accordance with the accepted rules of construction applicable to the other sections of the lease. By its own terms, section 3(d) is cumulative of either sections 3(b) or 3(c). It provides such royalty is "in addition to any royalties provided for in paragraphs above." It further provides the Lessee shall pay a royalty "on residue gas sold or used for any purpose". Where sections 3(b) and 3(c) provide certain royalties for "casinghead gas" section 3(d) provides for a royalty for "residue gas". These terms are not synonymous. They have different meanings in the oil and gas industry and by accepted definition. One witness, an experienced oil and gas man, defined casinghead gas as "the gas which physically is produced in conjunction with the production of oil". This in essence is the same definition generally used and understood in the industry. Mussellem v. Magnolia Petroleum Company, 107 Okl. 183, 231 p. 526, quotes with approval the definition found in regulations of the Interior Department, to-wit: "Casing-head gas—the gas from an oil well coming through the casing, with the oil from oil producing strata". See also Magnolia Petroleum Company v. Connellee (Tex.Comm. App.) 11 S.W.2d 158. On the other hand, "residue gas" is that gas which remains after such elements as propane, butane, and gasoline have been removed. Tidewater Associated Oil Co. v. Clemens (supra). Utilities Production Corporation v. Carter Oil Co., 72 F.2d 655 (10th Cir.). It is apparent "casinghead gas" and "residue gas" were not meant to be used interchangeably. They clearly refer to the gas

at a different stage of processing or treatment. Under this record lessee's gas was casinghead gas at the outlet of the separator and at the time it was sold to Dorchester. Their contract with Dorchester was a "Casinghead Gas Purchase Contract". This contract defined casinghead gas as "the vapor stream including all compounds and elements contained therein at the outlet of the separator which was produced from a well which has its rate of production controlled by the volume of oil simultaneously produced from the reservoir". This is the generally understood meaning of casinghead gas. This casinghead gas was then run through Dorchester's processing plant. There, certain elements and compounds were removed by fractionating in the plant. The remainder of the gas then was moved into Northern's transmission lines at the plant's outlet. The latter gas is the residue gas that is referred to in section 3(d).

Was the lessor entitled to an additional 3/16 royalty on this residue gas? We think not. Residue gas comes into being only after the processing provided for in section 3(c). Residue gas comes from processing either "dry gas", which is gas coming from a gas well, or casinghead gas by fractionating or absorption. It does not come from running oil through a separator. Although it may be argued the separation of casinghead gas from the oil by the separator technically makes the casinghead gas residue gas as to the oil, this is not in conformity with the accepted meaning of residue gas. The lessees handled their production in accordance with section 3(b) and paid royalty thereunder. They did not choose to process the casinghead gas as provided for in section 3(c). It necessarily follows there was no residue gas involved as between the lessor and lessees. Title to the casinghead gas passed from the lessees to Dorchester at the separator. The lessees exercised no control of the gas beyond that point. Lessor's claim to royalty under 3(d) is conditioned upon being entitled to royalty under 3(c). Hav-

ing determined gas royalty was not due under this latter section, it follows lessees are not obligated to pay royalties under 3(d).

A great deal of testimony was offered to show the "highest prices paid for residue gas in the area" as provided for in 3(d). Most of the evidence was excluded by the trial court. However testimony of this fact becomes immaterial in view of our holding royalty is not recoverable under section 3 (d). Thus the highest price paid for residue gas in the area does not come into play. Where under the pleadings and evidence the lessor was not entitled to recover, it was proper for the trial court to disregard the jury finding of highest price of residue gas in the area and render judgment for appellees.

The judgment of the trial court is affirmed.