PHILLIPS PETROLEUM COMPANY,
Plaintiff-Appellee,

v.

J. H. ADAMS et al., Defendants.

Robert O. SCHNELL, W. S. Etchieson,
and Jack Gross,
Defendants-Appellants,

v.

J. H. ADAMS, Waylon Adams, and
Arlwone H. Adams,
Defendants-Appellees-Appellants.

No. 74–1777.

United States Court of Appeals,
Fifth Circuit.

May 22, 1975.

Rehearing and Rehearing En Banc
Denied June 18, 1975.

R. C. Hamilton, Robert L. Templeton, Amarillo, Tex., for Adams Family.

J. E. Blackburn, Spearman, Tex., for Patricia Nelson.

Before TUTTLE, GEWIN and GOLD-BERG, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case of first impression, and in two similar cases also decided today, First National Bank v. Phillips Petroleum Co., 5 Cir. 1975, 513 F.2d 371, and Phillips Petroleum Co. v. Riverview Gas Compression Co., 5 Cir. 1975, 513 F.2d 374, we must determine the rightful owners of funds payable by a pipeline company under contracts for the sale of casinghead gas,[1] where the gas underlying the debts was produced while the mineral leases were held by claimants who assigned their leasehold interests to other claimants before the debt owed by the pipeline company became due and payable.[2] After certain preliminary skirmishing, the pipeline company brought this diversity interpleader action to obtain a judicial resolution of its contractual difficulties. The assignor-claimants (those who held the leasehold interest at the time the gas was produced) counterclaimed against the pipeline company for interest on the funds held by the company. After a trial without a jury, the district court decided that the assignor-claimants ought to have the principal sum involved but that the pipeline company owed them no interest; the pipeline company, the assignor-claimants and the

John E. Morrison, Borger, Tex., for Schnell and others.

Thomas L. Cubbage, II, Jack Ritchie, Amarillo, Tex., for Phillips Petroleum Co.

1. "Casinghead gas" is a term used in the oil and gas industry to describe the gas which flows from the casinghead of an oil well. The production of this type of gas is usually considered incident to the production of oil from the same sources. *See generally* Read v. Britain, Tex.Civ.App.1967, 414 S.W.2d 483, aff'd, Tex.1967, 422 S.W.2d 902; Hardwicke, Evolution of Casinghead Gas Law, 8 Tex.L.Rev. 1 (1929).

2. The problem presented by these three cases has attained epidemic proportions in the Texas Panhandle. By the time these cases were orally argued before this Court, in December, 1974, there were seven similar actions on the civil docket in the United States District Court for the Northern District of Texas, Amarillo Division, and three other such cases in the Texas courts. Phillips says that it has 966 percentage-of-proceeds contracts of the type involved here in the Texas Panhandle alone; $9,700,000 in payments is now due under these contracts.

assignee-claimants all appeal. We affirm the district court's decision as to the ownership of the principal sum; we believe, however, that equity requires that the assignor-claimants should receive interest as well, so we must reverse that portion of the judgment below relating to interest.

I

On July 1, 1963, the assignor-claimants [the Adams family] purchased an oil and gas lease on property situated in Hutchinson County, in the Texas Panhandle. At the time of this purchase, a casinghead gas contract was in force between Phillips Petroleum Company [Phillips] and the holders of the mineral rights to the property. This contract provided that Phillips would purchase the casinghead gas produced on the lease and would pay therefor a price based on the price which Phillips itself obtained for all gas sold by it which originated in the Panhandle Field of Texas. On September 1, 1966, the Adams family concluded another percentage-of-proceeds gas sales agreement with Phillips which was substantially similar to the one in force from 1963 until 1966.

In 1967, one Schnell, a friend of one of the Adamses, expressed interest in purchasing the mineral leasehold interest in the Hutchinson County property. A deal was soon worked out, and on June 5, 1967, the Adams family conveyed to Schnell "all right, title and interest of the Original Lessee and present owners in and to [the lease in question], and rights thereunder . . . together with all personal property and equipment used or obtained in connection therewith, and located thereon. . ." The assignment was to be effective as of June 1, 1967, at 7:00 a. m. The very next day, Schnell conveyed his interest in the property to two business associates, Etchieson, a recently-retired Phil-

lips executive, and Gross. On September 27, 1968, Etchieson and Gross reconveyed their interests to Schnell, who held title to the mineral rights in question when this lawsuit commenced. We shall henceforth refer to Schnell, Etchieson and Gross as "the Schnell group."

The difficulty in this case arises from the pricing provision in the casinghead gas contracts, for just as the price Phillips undertook to pay to the holder of the mineral rights was pegged upon the average price of gas sold in the Panhandle Field, that field price was in turn dependent upon the rate that the Federal Power Commission allowed Phillips to charge for its gas, which latter variable was very variable indeed until long after the Adams family had assigned its lease to Schnell. In 1954, in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, the United States Supreme Court determined that the Natural Gas Act, 15 U.S.C. § 717 et seq., [the Act] requires the Federal Power Commission to regulate well-head sales by producers of natural gas to interstate pipeline companies for interstate transportation and resale. From that time, gas prices charged by pipeline companies such as Phillips have been subject to FPC approval.

In the nature of things, pipeline companies desire to raise their gas prices from time to time, and, also in the nature of things, the wheels of the FPC's rate-setting mechanism grind slowly, at best. To add to the obvious difficulties attendant upon long waits for approval of price increases, a pipeline company may not file retroactive price increases, 15 U.S.C. § 717c(d) and (e); Atlantic Refining Co. v. Public Service Commission, 1959, 360 U.S. 378, 389, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312, 1319–20; Shell Oil Co. v. FPC, 3 Cir. 1964, 334 F.2d 1002, 1009; see 18 C.F.R. § 154.102,[3] so that if

---

3. Section 717c provides, in pertinent part:

    (a) All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regula-

tions affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

    (c) Under such rules and regulations as the Commission may prescribe, every natu-

a pipeline company were to wait for FPC approval of a proposed price hike, it might very well lose ten years' worth of increased prices. Congress has resolved this difficulty by allowing a pipeline company to increase its prices on its own initiative, subject to a five-month sus-

pension period which may be imposed by the FPC, and subject to a duty to refund to its purchasers any portion of the increase that the FPC ultimately fails to approve. 15 U.S.C. § 717c(e); 18 C.F.R. § 154.102.[4] The FPC may also order the pipeline company to pay seven per cent

ral-gas company shall file with the Commission, . . . and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public.

.    .    .    .    .

(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company, or upon its own initiative without complaint, at once, . . . but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, . . . may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect, and after full hearings, . . . the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may . . . require the natural-gas company to furnish a bond . . . to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its deci-

sion found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

4. See generally Placid Oil Corp. v. FPC, 5 Cir. 1973, 483 F.2d 880, aff'd sub nom. Mobil Oil Corp. v. FPC, 1974, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72; Phillips Petroleum Co. v. FPC, 10 Cir. 1965, 349 F.2d 535; Comment, Refund Beneficiaries and Refund Benefits Under the Natural Gas Act, 41 U.Chi.L.Rev. 792 (1974).

18 C.F.R. § 154.102 provides, in part:

(a) If a rate suspension proceeding initiated under section 4(e) of the Natural Gas Act has not been concluded and an order made at the expiration of the suspension period, the proposed change of rate, charge, classification, or service shall go into effect upon motion of the independent producer proposing the change as the legally effective rate and shall be charged, effective as of a date not earlier than the date of receipt of such motion by the Commission or the expiration of the suspension period, whichever is later.

.    .    .

(b)(1) Unless otherwise ordered by the Commission, increased rates or charges shall be charged and collected pursuant to paragraph (a) of this section and there shall be filed by the independent producer a surety bond, or other undertaking, to be approved by the Secretary, to comply with the provisions of paragraph (c) of this section.

(2) In compliance with subparagraph (1) of this paragraph, an independent producer may file a general undertaking affording blanket refund coverage of any present and future rate increases suspended under section 4(e) of the Natural Gas Act and collected subject to refund thereunder. Upon acceptance of such general undertaking, the producer need not file further refund assurance when filing a motion to make increased rates effective unless specifically required to do so by an order of the Commission.

(c) Upon an increased rate being made effective pursuant to the provisions of this section the independent producer shall be obligated to keep accurate accounts in detail

interest on refunded monies if equitable considerations so dictate. 15 U.S.C. § 717c(e); 18 C.F.R. § 154.102(c).[5]

■ · The effect of this regulatory scheme is that the pipeline company collects the increased prices for years and years, using the funds thus collected as it pleases, although it will ordinarily characterize this "suspense money" as a liability for accounting purposes. *See* Ashland Oil & Refining Co. v. Staats, Inc., D.Kan.1967, 271 F.Supp. 571, 578. Then, one fine day, the FPC tells the pipeline company which portion of the funds it can keep and which portion it must refund to its purchasers, with interest. At this point, the pipeline company, such as Phillips in this case, must recompute the price it must pay to its suppliers under percentage-of-proceeds production agreements such as the ones involved here.[6] Where the ownership of the mineral leasehold interest does not change during the ten or fifteen years in which the FPC is pondering the proposed price increase, all the pipeline company need do is to send a check along to the current leaseholder. Where, as here, the leasehold has changed hands in the interim, the pipeline company's task is more difficult.

In this case, Phillips filed a proposed price increase with the FPC subsequent to the Supreme Court's decision in Phillips Petroleum Co. v. Wisconsin, *supra*, and charged its customers the higher price, subject to refund, during the period in which the Adams family held the leasehold interest in the property involved in this lawsuit. From 1963 until 1967, Phillips made monthly payments to the Adams family, based only on the "firm proceeds" of its own sales, that is, proceeds calculated on the rate which the FPC had already approved; the pipeline company deferred any payments calculated on the basis of the higher, unapproved prices which Phillips was actually charging its customers throughout the period. On September 18, 1970, the FPC finally concluded its deliberations on Phillips' proposed rate hikes, approving a portion of the price increases but rejecting another portion.[7] Hugoton-Andarko Rate Case, Op: 586, 44 F.P.C. 761, aff'd, 9 Cir. 1972, 466 F.2d 974. After the Ninth Circuit affirmed the FPC's order, Phillips divided the principal sum of the suspense money collected over the years into two categories: "refundable monies," which it returned to its purchasers with interest, and "sustainable monies," to which it now had certain entitlement. But a portion of these sustainable monies represented certain debts payable to all producers who had supplied Phillips with gas under percent-

of all amounts received by reason of the increased rates or charges for each billing period, and for each purchaser; the billing determinants of natural gas sales to such purchasers and the revenues resulting therefrom, as computed under the rates in effect immediately prior to the effective date of the change, and under the rates which became effective pursuant to the motion, together with the differences in the revenues so computed; and to refund at such times and in such amounts to the persons entitled thereto, and in such manner as may be required by final order of the Commission, the portion of any increased rate found by the Commission in that proceeding not justified, together with interest thereon at the rate of seven percent per annum from the date of payment to the producer until refunded.

5. *See* Hunt Oil Co. v. FPC, 5 Cir. 1970, 424 F.2d 982; Texas Eastern Transmission Corp. v. FPC, 5 Cir. 1962, 306 F.2d 345, cert. denied sub nom. Manufacturers Light & Heat Co. v.

Texas Eastern Transmission Corp., 1963, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273; Brooklyn Union Gas Co. v. Transcontinental Gas Pipe Line Co., S.D.Tex.1960, 201 F.Supp. 679, aff'd sub nom. Socony Mobil Oil Co. v. Brooklyn Union Gas Co., 5 Cir. 1962, 299 F.2d 692, cert. denied, 371 U.S. 887, 83 S.Ct. 182, 9 L.Ed.2d 121.

6. Phillips urges that it really has no obligation to recompute the price it must pay to its suppliers under percentage-of-proceeds contracts, and that the Adams family consequently ought not to question such beneficence as Phillips might demonstrate. We believe that the law of contract obliges Phillips to pay in full for the gas that it purchases, regardless of the time at which the full measure of payment may be revealed.

7. The effective date of the order was October 1, 1970.

age-of-proceeds contracts. With respect to the particular property involved here, Phillips determined that the Schnell group was the undisputed owner of all sustainable monies due on gas produced after June 1, 1967, and Phillips settled a dispute with the Adams family's predecessors in interest with respect to monies collected before 1963. It was readily apparent, however, that the Adams family and the Schnell group were irremediably antagonistic with respect to the 1963–1967 funds, so Phillips brought this interpleader action to determine title to $12,296.81, which sum was the amount that Phillips owed either to the Adams family or to the Schnell group for gas purchased during 1963–1967.[8]

## II

The district court ruled that the Adams family ought to receive the disputed suspense money, on the ground that the payments were "in part payment of gas severed from the leasehold estate and sold therefrom prior to any assignment of the lease by the Adams family," and that the document of assignment from the Adams family to Schnell could not be construed to constitute an assignment of the suspense money. The Schnell group and Phillips[9] argue that the money was not due and payable until after the FPC order in *Hugoton-Andarko*, and contend that since the order was not made until well after the Adams family had conveyed its leasehold interest to Schnell, the contingent right to the money attached to the mineral estate. In these circumstances, Schnell and Phillips conclude that since the Adams family did not expressly reserve this contingent right in the instrument of assignment, the right to any suspense money passed to Schnell. Schnell urges that even though the gas for which the disputed funds are partial payment was produced while the Adams family held the lease-

hold interest, the right to payment did not become certain and enforceable until after the FPC order, so that this case is analogous to decisions involving dividends on stock, interest on notes and unaccrued rent on real estate, where the income goes to the party who holds title to the principal property on the date the dividend, interest or rent is declared or becomes due.

■ The Schnell group and Phillips are undoubtedly correct in their contention that the Adams family had no enforceable right to the suspense money during the time when they held the leasehold interest, for neither Phillips nor the Adams family had any reasonable expectation during 1963–1967 that the FPC would approve the higher prices upon which the suspense money was based. Neither party could claim full title to any part of the disputed funds until the FPC had determined the validity of the price increases.

In Ashland Oil & Refining Co. v. Staats, Inc., D.Kan.1967, 271 F.Supp. 571, individuals situated similarly to the Adams family here demanded that a pipeline company pay them suspense money *before* the FPC had taken any action on the suspended price increase which had produced the funds. The district court reasoned that the right to payment of the parties analogous to the Adams family:

> can be no greater than the lessee's right to the monies from which those royalties derive. Ashland [the pipeline company] has no final enforceable right to these funds, for they have not been approved, and may be rescinded. [The pipeline company] holds them subject to refund, and is responsible for any refund which may be ordered. We perceive no ground on which Ashland should be compelled to pay out sums, for the refund of which it may be liable, and as to which its own right

---

8. Phillips actually deposited $16,161.88 into court, but $3,865.07 of this sum is attributable to an undisputed overriding royalty interest.

9. Although Phillips is the stakeholder in this interpleader action, the pipeline company has

from the beginning urged the validity of the Schnell group's claim as against that of the Adams family, for the reason that the Schnell group, unlike the Adamses, does not claim interest on the suspense money from Phillips.

is not finally determined, to royalty owners whose own right to royalties from those funds will be finally determined only when Ashland's own right is determined. . . . If Ashland were required to pay over funds which it now holds, and a refund of all or any part thereof were subsequently ordered, it would have to demand repayments from a large number of royalty owners, and risk the necessity of a multiplicity of legal actions. Ashland has taken a course designed and intended best to serve the interest of the royalty owners and of itself. As a result, it holds the sums sought in what is roughly analogous to a fiduciary capacity. In our view, [the royalty owners have] stated no right to recover royalties on these funds, when it is not yet finally determined that they represent lawful proceeds from the sale of gas.

271 F.Supp. 571, 579.

We believe that the *Staats* court correctly stated the law governing Phillips' contractual relations with the Adams family during 1963–1967. *See* Boutte v. Chevron Oil Co., E.D.La.1970, 316 F.Supp. 524, aff'd, 5 Cir. 1971, 442 F.2d 1337.[10] The fact that the Adams family had no final and enforceable right to the suspense money in 1963–1967, however, does not foreclose the possibility that they retained the contingent right to the funds after their assignment to Schnell and that the FPC's 1970 order converted that contingent right into a right presently enforceable against Phillips. The resolution of this question requires us to investigate the Texas law of contract and property.

█ It is the law in Texas, as elsewhere, that where a contract is unambiguous, we must look solely to the

terms thereof to determine its meaning. Hennigan v. Chargers Football Co., 5 Cir. 1970, 431 F.2d 308; Tenneco Oil Co. v. Alvord, Tex.1967, 416 S.W.2d 385; Wahlenmaier v. American Quasar Petroleum Co., Tex.Civ.App.1974, 517 S.W.2d 390, no writ. All of the parties here agree that the instrument of assignment is unambiguous, and that document alone can show which property interests passed to Schnell and which were retained by the Adams family. The Adams family conveyed to Schnell:

> all right, title and interest . . . in and to [the lease], and rights thereunder, . . . together with all personal property and equipment used or obtained in connection therewith, and located thereon . . . [The Adams family also warranted that they] are the lawful owners of the interest in said oil and gas lease . ., and of all personal properties thereon, or used in connection therewith; . . and that said rights, interest and property are free and clear from all liens and encumbrances, and that all rentals and royalties due and payable under said oil and gas lease have been fully paid.
>
> This oil and gas lease shall be effective as of June 1, 1967, at 7:00 A.M.

█ The assignment appears on its face to pass title to all realty interests, effective as of 7:00 A.M. on a day certain, and all personal property interests bound up with the operation of the wells; there is no mention of the right to the suspense money or of any other personalty unrelated to the extraction process. In a conveyance of real property, all of the interests in land ordinarily pass to the grantee unless specifically exempted, for deeds are strictly construed against the grantor. Tenneco Oil

---

10. We note that Phillips does not always hold suspense money in its own accounts until the FPC approves or disapproves the underlying rate increases. The record contains two form letters from Phillips, one written to Etchieson of the Schnell group, dated February 20, 1968, and the other written to the Adams family with regard to another piece of property, dated August 13, 1971, in which Phillips (apparently at the request of Etchieson and the Adams family) agreed to pay suspense money to the addressees *as it was collected*, on the condition that they would agree to reimburse Phillips, with interest, for any suspense money which the FPC might require Phillips to refund to its customers. The approach adopted by Phillips in those instances would obviate the difficulties presented by this case.

Co. v. Alvord, *supra* ; Humble Oil & Refining Co. v. Harrison, 1947, 146 Tex. 216, 205 S.W.2d 355; Melton v. Davis, Tex.Civ.App.1969, 443 S.W.2d 605, writ ref'd n.r.e. On the other hand, it is usually the case that personal property does not pass in the assignment of an oil and gas lease unless it is expressly passed. *See e. g.,* Moore v. Carey Bros. Oil Co., Tex.Comm'n App.1925, 269 S.W. 75; Cox v. Rhodes, Tex.Civ.App.1950, 233 S.W.2d 924; Continental Oil Co. v. Gillespie, Tex.Civ.App.1944, 178 S.W.2d 728, no writ; East Texas Refining Co. v. Helvir Oil Co., Tex.Civ.App.1935, 82 S.W.2d 392, writ dism'd w.o.j.; 3 W. Summers, Oil and Gas § 555. Thus, the problem in this case is whether the contingent right to the suspense money constituted a realty or a personalty interest. If the right to the money is a realty interest, the assignment passed that right to Schnell, but if the right is in the nature of personalty, the Adams family did not expressly convey the right and therefore retained it.

■■■ Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production. Harrington v. Texaco, Inc., 5 Cir. 1964, 339 F.2d 814, cert. denied, 1965, 381 U.S. 915, 85 S.Ct. 1538, 14 L.Ed.2d 435; Humble Oil & Refining Co. v. West, Tex.1974, 508 S.W.2d 812; Phillips Petroleum Co. v. Mecom, Tex.Civ. App.1964, 375 S.W.2d 335, no writ; Lone Star Gas Co. v. Murchison, Tex.Civ.App. 1962, 353 S.W.2d 870, writ ref'd n.r.e. With respect to debt obligations incurred as oil and gas are produced, unaccrued royalty interests, oil payments and bonus payments are deemed by Texas courts to be interests in realty, for such rights represent interests in the oil and gas still in place on the property. *See* Clyde v. Hamilton, Tex.1967, 414 S.W.2d 434; Tennant v. Dunn, 1937, 130 Tex. 285, 110 S.W.2d 53; Sheffield v. Hogg, 1935, 124 Tex. 290, 77 S.W.2d 1021, on rehearing, 124 Tex. 311, 80 S.W.2d 741; *see generally* Walker, Oil Payments, 20 Tex.L.Rev. 259 (1942). The rule is otherwise when the minerals giving rise to the right to

payment have already been taken from the ground, for the right to future payments on past production cannot be said to burden the mineral estate in the same way as an interest in future production. The right to payment for past production obviously has no effect upon the value to the leaseholder of the oil and gas still in the ground at the time the mineral estate changes hands—which property is the usual object of leaseholder interest. So it is that accrued royalty interests are personal property, Miller v. Hathaway, Tex.Civ.App.1972, 477 S.W.2d 655, no writ, as is the right to payment for severed minerals. Shell Oil Co. v. State, Tex.Civ.App.1969, 442 S.W.2d 457, writ ref'd n.r.e.

The district court here reasoned that since the disputed funds are partial payment for gas produced while the Adams family held the leasehold interest, those individuals also held a contingent personal right to payment during 1963–1967, so that the Texas rules of contractual construction compelled the conclusion that the Adams family did not convey these personal property rights to Schnell. The Schnell group and Phillips argue that the disputed money cannot represent a personalty interest founded on a debt, because this purported debt did not become due and payable until after the FPC order, that is, long after the Adams family had conveyed its interest in the leasehold estate to Schnell.

■■ Although there are no Texas cases (nor cases from any other jurisdiction) which have dealt with the problem of suspense money not currently due and payable, common sense and elemental fairness can lead only to the conclusion that the Adams family had a right to payment *in full* for the gas they sold to Phillips, and that they have at no time relinquished their right to complete compensation. The Texas law, as set out above, dictates a like result. In East Texas Refining Co. v. Helvir Oil Co., *supra,* for example, an assignor of an oil and gas lease quarreled with the assignee over the right to payments for oil which had already been produced and

sold to a third party at the time the assignment was made. The language of the instrument there was similar to that of the assignment here, and the Texas court held that the assignor had not conveyed its right to payment:

> If we give to the lease contract the construction most favorable to [the assignee's] contention, it transfers to [the assignee] [the assignor's] interest in the lease and all property incident to such lease. These prior oil runs had been taken from the lease and sold and delivered to [a third party] and were not, on [the date of the assignment] connected with or incident to the lease, and could not be transferred to [the assignee] by a mere transfer of such lease.

82 S.W.2d 392, 395.[11]

██ We do not believe that our case should be decided differently from *East Texas Refining* simply because the assignor there had a right to payment in full by the time of the assignment, while the Adams family could not know the extent of its earnings until several years after the assignment to Schnell. The

Adamses owned the gas in place at the time of extraction, at which point they exchanged their right to the gas for the right to be paid therefor. The fact that the debt was not liquidated on the date of assignment, and could not be ascertained for some time thereafter, does not make it any less a personal property right. The Adams family did not convey this right to Schnell, and they are entitled to the suspense money now in the registry of the district court.[12]

### III

With respect to interest, the district court found that Phillips could not safely disburse the suspense money until October 28, 1972, the date on which the FPC's *Hugoton-Andarko* order became immune from further legal attack, and that from that time until December 21, 1973, the date on which Phillips paid the disputed funds into court, Phillips was a stakeholder faced with conflicting claims to a single fund. These circumstances, coupled with the failure of the Adams family to demand that Phillips pay the money into court, convinced the district

11. We note that the Texas state tax on the production of oil, a tax payable by the producer of the oil, accrues when the oil is produced—and not when it is paid for. Tex. Tax.-Gen. art. 4.01 et seq., V.A.T.S.; State v. Humphrey, Tex.Civ.App.1942, 159 S.W.2d 162; *see also* Alexander v. Texaco, Inc., 5 Cir. 1973, 482 F.2d 1248; Fain-McGaha Oil Corp. v. Murko Oil & Royalty Co., 1937, 128 Tex. 646, 101 S.W.2d 547.

12. The Schnell group argues, in face of the rule of construction of unambiguous contracts, that the Adams family intended to convey their right to the suspense money. We believe that the evidence offers no support for this contention, and that the best evidence of the Adams family's intentions is the assignment itself, which makes no mention of the suspense money; that document compels the legal conclusion that the Adams family retained their right to the disputed funds.

Finally, Phillips argues that "public policy imperatives" require that the disputed funds go to the Schnell group, for the reason that "the practical effect of the decision of the trial court . . . will be to create more problems than it solves. Courts exist to resolve, not create, problems; consequently this portion of the decision is contrary to public poli-

cy." This interesting argument is founded on the consideration that if we were to decide that the Schnell group should have the suspense money, all Phillips would have to do in order to fulfill its obligations with respect to its 900-odd percentage-of-proceeds contracts would be to determine who held the mineral leasehold interests on October 28, 1972 (the last date for appeal from the Ninth Circuit's affirmance of the FPC's *Hugoton-Andarko* order—the date on which Phillips believes its various debts became due and payable), and then to pay those parties. A decision that the Adams family holds title to the funds as personal property, however, would expose Phillips to the travails of determining the owners of property which can be transferred without entry upon the public records. Phillips also offers the observation that since federal regulation of the natural gas industry is to blame for this mess in the first place, the federal courts ought not compound the confusion by forcing Phillips to pay debts where there may be conflicting claims to the suspense money. This case indicates that Phillips is well aware of the availability of interpleader actions in the federal and state courts, and neither of the arguments advanced above seems to us to warrant the alteration of the Texas law of contract and property.

court that neither equity nor Texas law supported an award of interest from Phillips to the Adams family based on the principal sum of the suspense money.[13] We believe that the district court erred in its construction of the law of Texas with regard to the award of interest, and we conclude that Texas law permits—and equity requires—the award of interest to the Adams family at Phillips' expense.

The Adams family predicates its prayer for interest upon the fact that Phillips had the use of the suspense money from 1963 until it paid the money into court in late 1973. They reason that if they have title to the principal sum of the suspense money, then they ought also to have the income which those funds generated while sitting in Phillips' general account. Phillips rejoins that the Texas statute governing the award of interest forbids such an award on a principal sum before that sum becomes due and payable, which in this case did not occur until October 28, 1972, and that the principal sum here has been the object of litigation since that date, so that no interest may be taxed against Phillips for any part of the ten-year period in which it used the funds for general corporate purposes.

■ Since the award of interest is in derogation of the common law, it is ordinarily the case that interest should be refused except in such cases as come within the terms of enabling legislation. Watkins v. Junker, 1897, 90 Tex. 584, 40 S.W. 11; Kirkpatrick v. Great American Ins. Co., Tex.Civ.App.1927, 299 S.W. 943, no writ. The Texas interest statute defines "interest" as "the compensation allowed by law for the use or forbearance or detention of money," and defines "legal interest" as "that interest which is allowed by law when [as here] the parties to a contract have not agreed on any particular rate of interest." Vernon's Ann.Tex.Rev.Civ.Stat. art. 5069–1.01. The legal rate of interest in Texas is six

percent per annum, "on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable . . .." Tex.Rev. Civ.Stat. art. 5069–1.03.

Phillips has done the Adams family no wrong, so that the Adamses cannot claim interest as an item of damages, nor does this case fall within the statutory rubric of "forbearance or detention" of money. Consequently, the Adams family can claim interest from Phillips only as "compensation allowed by law for the use . . . of money. *See* Kishi v. Humble Oil & Refining Co., 5 Cir. 1926, 10 F.2d 356; Walter E. Heller & Co. v. Barnes, Tex.Civ.App.1967, 412 S.W.2d 747, writ ref'd n.r.e.; Sherrill v. Phillips, Tex.Civ.App.1966, 405 S.W.2d 627, writ ref'd n.r.e. The apparent difficulty with such a theory of recovery is that the statute seems to allow interest only on "written contracts ascertaining the sum payable, from and after the time when the sum is due and payable." while the principal sum here was neither ascertainable nor due and payable until after the FPC order became final, long after the suspense money began to accumulate. The Texas courts, however, have interpreted the interest statute in a liberal manner, so as to do substantial justice. For example, although the statute seems on its face to require a liquidated amount due on a definite date if interest is to be awarded, the statute has been construed to allow interest if the amount of recovery depends on conditions existing at the due date, even though the amount may be unascertained and disputed until the conclusion of the trial. Evans Production Co. v. Shaw, 5 Cir. 1960, 276 F.2d 313, reh. den., 277 F.2d 927, cert. denied, 364 U.S. 819, 81 S.Ct. 54, 5 L.Ed.2d 50; Texas Co. v. State, 1955, 154 Tex. 494, 281 S.W.2d 83; Johnson v. Downing & Wooten Const. Co., Tex.Civ.App.1972, 480 S.W.2d 254, no writ. Moreover, although Texas courts have been more strict in refusing interest for periods pri-

---

**13.** A full elucidation of the district court's resolution of the interest question may be found in its subsequent opinion in Phillips Petroleum Co. v. Riverview Gas Compression Co., D.C. Tex., 372 F.Supp. 282, 285–86.

or to the time when an obligation becomes due and payable, *see e.g.,* Hayek v. Western Steel Co., Tex.1972, 478 S.W.2d 786; G & W Marine, Inc. v. Morris, Tex.Civ.App.1971, 471 S.W.2d 644, at least one Texas court has awarded interest in a contract case for a period prior to the due date of the debt, apparently for equitable reasons. Treon v. Richter, Tex.Civ.App.1954, 265 S.W.2d 125, writ ref'd n.r.e.

▮ A reading of all the relevant Texas cases convinces us that interest is awarded or refused in that jurisdiction only after a careful consideration of all the circumstances in the particular case, and that the Texas interest statute is sufficiently flexible to permit the courts to do equity.[14] Our belief is strengthened by the knowledge that this Court has consistently awarded or approved the award of interest in cases applying Texas law.[15] *See, e.g.,* Sid Richardson Carbon & Gasoline Co. v. Phillips Petroleum Co., 5 Cir. 1972, 456 F.2d 203; Gorsalitz v. Olin Mathieson Chemical Corp., 5 Cir. 1970, 429 F.2d 1033; Colonial Refrigerated Transportation, Inc. v. Mitchell, 5 Cir. 1968, 403 F.2d 541; Evans Production Co. v. Shaw, *supra*; Natural Gas Pipeline Co. v. Harrington, 5 Cir. 1957, 246 F.2d 915, cert. denied, 356 U.S. 957, 78 S.Ct. 992, 2 L.Ed.2d 1065; H. B. Zachry Co. v. Terry, 5 Cir. 1952, 195 F.2d 185, cert. denied, 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637; Phillips Petroleum Co. v. Williams, 5 Cir. 1947, 158 F.2d 723;

Kishi v. Humble Oil & Refining Co., *supra*; Brooklyn Union Gas Co. v. Transcontinental Gas Pipe Line Co., *supra*.

▮ Since we have concluded that the Texas statute does not preclude the award of interest to the Adams family, we now turn to the more difficult problem of whether interest ought to be awarded in the context of the facts in the case at bar. In this case, Phillips collected money over a period of several years which would ultimately be refunded to its customers or paid to its suppliers; in no event did Phillips ever have the slightest prospect of entitlement to the entire principal sum of suspense money here in question. This money was not placed in an escrow account, nor was it paid to the suppliers as it accumulated, subject to refund, with interest—a course of action followed by Phillips in other instances. *See* n.10, *supra*. Instead, burdened with the knowledge that it might have to refund some or all of the funds to its customers at seven percent interest, Phillips placed the suspense money in its general account and used it, presumably, in the manner most advantageous to the corporate fisc. Such a course was certainly sound business practice, and in no way repugnant either to the federal regulatory scheme or to Phillips' contractual relations with its suppliers. But that is not to say that Phillips may enrich itself with the income from the Adams family's suspense

14. Cases in which Texas courts have awarded interest in apparent contravention of the literal meaning of the statute's "ascertainability" and "due and payable" requirements include: Davidson v. Clearman, Tex.1965, 391 S.W.2d 48; Watkins v. Junker, *supra*; Hayek v. Western Steel Co., *supra*; Beck v. Lawler, Tex.Civ.App.1968, 422 S.W.2d 816, writ ref'd n.r.e.; Haggar Co. v. Rutkiewicz, Tex.Civ.App.1966, 405 S.W.2d 462, writ ref'd n.r.e.; DeLeon v. Aldrete, Tex.Civ.App.1965, 398 S.W.2d 160, writ ref'd n.r.e.; City of Corpus Christi v. Drought, Tex.Civ.App.1964, 380 S.W.2d 645, writ ref'd n.r.e.; City of El Paso v. Nicholson, Tex.Civ.App.1962, 361 S.W.2d 415, writ ref'd n.r.e.; Arcadia Refining Co. v. Cook, Tex.Civ.App.1940, 146 S.W.2d 767, writ dism'd jdgmt. cor.

Cases in which Texas courts have strictly construed the interest statute so as to deny interest include: Cox v. Davidson, Tex.1965, 397 S.W.2d 200; Zummo Cattle Co. v. Millard, Tex.Civ.App.1972, 482 S.W.2d 17, writ ref'd n.r.e.; Ryan v. Thurmond, Tex.Civ.App.1972, 481 S.W.2d 199, writ ref'd n.r.e.; Winandy Greenhouse Construction, Inc. v. Graham Wholesale Floral, Inc., Tex.Civ.App.1970, 456 S.W.2d 470, no writ; Hull v. Freedman, Tex. Civ.App.1964, 383 S.W.2d 236, writ ref'd n.r.e.

15. Two exceptions to this general trend, Gulf Oil Corp. v. Olivier, 5 Cir. 1969, 412 F.2d 938; and Atwood v. Humble Oil & Refining Co., 5 Cir. 1964, 338 F.2d 502, cert. denied, 1965, 381 U.S. 926, 85 S.Ct. 1562, 14 L.Ed.2d 684, are discussed *infra*.

money in the absence of any contractual sanction.[16]

Texas jurisprudence is relatively unencumbered by decisions expressly invoking the equitable doctrine of unjust enrichment,[17] but many of the interest decisions already mentioned indicate some concern that the party against whom interest is awarded should not profit from its possession of the principal sum in question. One such case is that of City of El Paso v. Nicholson, Tex.Civ.App. 1962, 361 S.W.2d 415, writ ref'd n.r.e., where money belonging to the plaintiff was wrongfully seized by El Paso police, placed in the municipal treasury, and used for general City purposes. The *Nicholson* court awarded interest to the plaintiff for the time his money had been ensconced in the City treasury, "not as a punitive measure, but merely because the City had the use of this sum of money . . ." 361 S.W.2d 415, 418.

We find a similar, and more venerable, precedent in Kishi v. Humble Oil & Refining Co., 5 Cir. 1926, 10 F.2d 356. In *Kishi*, rival oil companies were producing oil from the same southeast Texas property under conflicting leases. In a commendable spirit of cooperation, each group of claimants agreed that the other group could continue production on the property, pending judicial resolution of the title dispute, at which time the losing oil company would refund its profits to the winning group. This court settled the title difficulty, and the losers paid the agreed principal sum to the winners; the latter then asked for interest on the principal for the period of four years in which the rival oil company held money which was eventually determined not to belong to it. We awarded interest to the successful claimants at the Texas statutory rate, even assuming that the losing oil company was a stakeholder, on the ground that the oil company:

had the use of the money, because [it] kept it, and therefore ought to pay interest as an incident to the principal debt. If [the oil company] had not wished to use the money, and thus be liable for interest, [it] could have deposited [the money] in the registry of the court. A stakeholder who retains money is liable for interest.

10 F.2d 356, 357.

Finally, in Brooklyn Union Gas Co. v. Transcontinental Gas Pipe Line Co., S.D. Tex.1960, 201 F.Supp. 679, aff'd sub nom. Socony Mobil Oil Co. v. Brooklyn Union Gas Co., 5 Cir. 1962, 299 F.2d 692, cert. denied, 371 U.S. 887, 83 S.Ct. 182, 9 L.Ed.2d 121, distributors of natural gas had overpaid a pipeline company, which overpayments were the result of excessive rates demanded of the pipeline company by certain major producers of gas. The distributors demanded that the producers refund the excess charges, with interest. After careful consideration, the district court awarded, and we approved, an award both of principal and interest to the distributors. With regard to interest, the district court reasoned that the producers:

have had the use of this money from the date of its receipt. Similarly, [the distributors] have been deprived of the use of such funds from the time these increase rates were reflected in [the pipeline company's] charges to them. Equitable considerations compel the conclusion that interest should commence from the respective dates of

---

16. Phillips suggests that the income from the suspense money is really a sort of compensation, incorporated *sub silentio* into each percentage-of-proceeds production contract, for its efforts in making blanket contract rate filings with the FPC pursuant to 18 C.F.R. § 154.91(e), thus enabling the small producers to obtain a "coattailing" benefit and avoid FPC filing expenses. The problem with this theory is that section 154.91(e) *requires* Phillips to make these blanket filings, and it would be somewhat strange for a producer to pay Phillips for performing the pipeline company's own regulatory obligations.

17. The case of Le Cuno Oil Co. v. Smith, Tex. Civ.App.1957, 306 S.W.2d 190, writ ref'd n.r.e., cert. denied, 1958, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147, is a classic unjust enrichment case, although the court preferred to use the terminology of "windfall or excessive allowance."

[the pipeline company's] overpayments to [the producers].

201 F.Supp. 679, 682–83.

One might object that these three cases are inapposite here, as the prevailing parties in *Nicholson*, *Kishi*, and *Brooklyn Union Gas* all were eventually found to have the sole title to and right to possession of the disputed principal sums during the entire time for which interest was to be awarded. In this case, on the other hand, we have already recognized that the Adams family had no right, contractual or otherwise, to possession of the corpus of the suspense money in the years before the FPC order, so that they could in no circumstances have enjoyed any income from the money in the absence of Phillips' collection and utilization thereof. This is precisely the basis for the general rule that interest is not allowable on a principal sum until that sum is due and payable, that is, until another party has a present right to the money, the deprivation of which denies that person the opportunity to invest the principal and earn money therewith.

However, this case presents a factual situation to which there are no close parallels in the Texas case law. We must decide whether it is better that one party (Phillips) should have the right to the possession of the principal sum, but not to the income, and that another party (the Adams family) should have the right to the income even though it had no right to possession of the principal during the accumulation of the income, *or* that a party (Phillips) which at no time had any claim to ownership of the principal sum should enjoy the income therefrom. We believe that the former rule is the more equitable one, not because Phillips has done anything wrong, but because Phillips ought not to be able to use someone else's money as it pleased for ten years, thereby enjoying a very considerable benefit, and then pay nothing for the use of the money. The *Nicholson*, *Kishi* and *Brooklyn Union Gas* cases illustrate the elemental equitable principle upon which we base our award of interest to the Adams family.

The district court's opinion in the companion case of Phillips Petroleum Co. v. Riverview Gas Compression Co., *supra*, held that this Court's decisions in Atwood v. Humble Oil & Refining Co., 5 Cir. 1964, 338 F.2d 502, and Gulf Oil Corp. v. Olivier, 5 Cir. 1969, 412 F.2d 938, forbade the award of interest to the Adams family at Phillips' expense. We believe that the able district judge misapprehended those two cases, and that neither case sets out a rule in conflict with the one we adopt here. *Atwood* was the culmination of a 20-year legal battle between Humble Oil and the owners of the vast King Ranch in south Texas over the interpretation of a mineral lease. Of particular importance to the determination of the interest question was the fact that Humble had repeatedly attempted to pay the owners the principal amount on which they were now demanding interest, but the owners had refused to accept the proffered payments. By making these spurned tenders, Humble had effectively deprived itself of the dominion over the money which is basic to any award of interest against a holder of funds. This court's refusal to award interest in *Atwood* was based on equitable considerations not unlike the ones which motivate our decision today, and that decision is certainly not a bar to the result here.

*Olivier* was another case which concluded a long wrangle over mineral rights, this time in Louisiana. Humble Oil had withheld certain overriding royalty payments from 1959 until our resolution of the dispute in 1969, and the individuals whom we adjudged to be entitled to the royalties demanded that Humble pay them interest for this period. We refused their request, since "Humble could not safely make the payments until the title question had been adjudicated." 412 F.2d 938, 946. Although *Olivier* would seem to be analogous to this case, the fact of the matter is that Humble had been paying the disputed royalties into the registry of the district court since 1962, *see* Olivier v. Humble Oil & Refining Co., E.D.La.1963, 225 F.Supp. 536, 539; Cutrer v. Humble

Oil & Refining Co., E.D.La.1962, 202 F.Supp. 568, 574, so that interest obviously could not be taxed against the oil company for that period. Furthermore, the genesis of the litigation, as in Kishi v. Humble Oil & Refining Co., *supra,* was a dispute between rival claimants to mineral rights in property from which Humble and Gulf Oil were removing oil. Since *Kishi,* many oil companies had solved the financial problems posed for them by that decision by inserting clauses into oil and gas leases providing that in the event of any dispute over title to the mineral interest in the subject property, the oil company concerned could withhold all payments, with no liability for interest thereon, until the dispute was resolved. The *Olivier* lease contained such a clause, *see* Cutrer v. Humble Oil & Refining Co., E.D.La.1961, 192 F.Supp. 757, 758, so that whatever the equitable considerations may have been in that case, we could not have awarded interest in the face of the contractual prohibition thereof. *Olivic.·* in no way conflicts with our decision here.

■■ The district court was also convinced that Phillips should not have to pay interest in view of its position as a stakeholder. We have already demonstrated that *Atwood* and *Olivier* offer no support for such a proposition. The general rule, moreover, is that the mere fact that an individual may be a stakeholder in no way immunizes him from the obligation to pay interest if he makes use of the money while it is in his possession, for the reason that a contrary rule would permit a person with no claim to a sum of money to enjoy a greater benefit from its possession than a person who makes such a claim, when that claim is later adjudged inferior to that of another person. *See* New York Life Ins. Co. v. Lee, 9 Cir. 1956, 232 F.2d 811; Great Lakes Transit Co. v. Marceau, 2 Cir. 1946, 154 F.2d 623; Massachusetts Mut. Life Ins. Co. v. Central Penn National Bank, E.D.Pa.1973, 372 F.Supp. 1027; John Hancock Mut. Life Ins. Co. v. Doran, S.D.N.Y.1956, 138 F.Supp. 47. The district court was of the opinion that

Bergendahl v. Blanco Oil Co., Tex.Civ. App.1969, 440 S.W.2d 81, writ ref'd n.r.e., indicated that the Texas rule is to the contrary, but the Texas court's ruling that "the [stakeholders] were not obligated to invest [the] funds," 440 S.W.2d 81, 85, infers that the *Bergendahl* stakeholders did not use the money they held, so that an award of interest would certainly have been improper. We do not believe that the Texas law in this area is different from that in other jurisdictions, *but see* Allied Building Credits, Inc. v. Grogan Builder Supply Co., Tex.Civ.App. 1963, 365 S.W.2d 692, writ ref'd n.r.e., and we conclude that Phillips is liable for interest for the period in which it enjoyed a reasonably free use of the money, that is, from the time Phillips collected the suspense money until the day it tendered or paid the funds into the registry of the district court.

■■ Phillips raises a contractual defense to liability for interest, on the basis of warranty clauses contained in its casinghead gas contracts with the Adams family, in which the latter group warranted title to the gas, and agreed that if their "title is questioned, or involved in litigation, [Phillips] shall have the right to withhold payment without interest during the pendency of such litigation, or until said title is freed from such question . . ." Phillips argues that whatever the equities of the situation may be, the Adams family waived any possible right to interest in its contracts with Phillips. The problem with this argument is that the warranty clauses, which are similar to that involved in *Olivier,* apply only to the title to the gas which Phillips purchased from the Adams family during 1963–1967. There has never been any question, however, that the Adams family had full title to the gas at the time of the sales to Phillips, and it is clear that they in no way breached their warranty agreement; the instant litigation stems instead from a disagreement as to which party should receive a partial payment for that gas. While Phillips may protest that this is too nice a distinction, it is precisely the

one which the contract itself requires; Phillips has no contractual defense to the payment of interest.

██ Phillips also urges that if it is to be charged with interest, we should not extend its liability beyond April 6, 1973, the date on which Phillips filed its complaint in interpleader and offered to pay the suspense money into court. Phillips did make an unconditional offer to relinquish possession of the money when it filed the complaint, but the Adams family failed to respond to the tender, so that Phillips finally paid the money into court on its own motion, on December 21, 1973. Once a stakeholder makes an unconditional offer to give up possession of a disputed fund, it ceases to exert that dominion over the money sufficient to justify an obligation to pay interest thereon, and the rule is that once such an unconditional tender is made, any liability for interest ceases as of the date of tender. Smith v. Transit Casualty Co., E.D.Tex.1968, 281 F.Supp. 661, aff'd, 5 Cir., 410 F.2d 210; Carter v. Barclay, Tex.Civ.App.1972, 476 S.W.2d 909, no writ; cf. Wm. A. Smith Contracting Co. v. West Central Texas Municipal Water Dist., 5 Cir. 1965, 344 F.2d 470. It follows that Phillips is not liable for interest beyond April 5, 1973.

Since there was no evidence presented below on the question of the proper amount of interest to be awarded to the Adams family, we remand this case to the district court for further proceedings not inconsistent with this opinion. The reasoning of our decision would ordinarily require that the Adams family receive interest at the statutory rate on the suspense money as it was collected during 1963–1967, and on the entire principal sum from June 30, 1967, until April 6, 1973. At trial, however, the Adams family asked for interest only from October 1, 1970, the date of the FPC's *Hugoton-Andarko* order, so their recovery must be limited to that amount.

## IV

In summary, we affirm the judgment of the district court with respect to the entitlement to the principal sum of the suspense money. Texas law requires specificity in conveyances of personal property in order to place an opaque curtain between the interests passed and those retained; after the curtain falls, only those things not explicitly transferred remain on the assignor's side of the stage. Texas jurisprudence clearly provides that the Adams family's right to payment for gas already produced is a personal right, and that right was not specifically mentioned in the instrument of assignment, so it follows that the Adams family did not convey their right to payment to Schnell, and they are now entitled to receive the disputed suspense money.

We also conclude that Phillips must pay interest on the principal sum of the suspense money, and we accordingly reverse the judgment of district court on this point. Texas courts do not insist on statutory rigidity in the allowance of interest, for they realize that the right to interest is a marketplace concept and that the use of money is a mercantile privilege which should not go uncompensated, absent countervailing considerations. To exonerate Phillips from its interest obligation here would be to give the pipeline company an extracontractual lagniappe, for it is incontrovertible that Phillips has derived a very considerable benefit from the unrestricted use of the Adams family's money. Phillips may say that its possession and utilization of funds to which it had no pretense of claim was reasonable, or even that its actions were necessary, but Phillips cannot be heard to say that it is fair and equitable that it should enjoy such a financial advantage for so long, and pay not a cent for it.

Affirmed in part; reversed in part and remanded.