# Legality of the International Agreement with Iran and Its Implementing Executive Orders

Executive orders providing for the establishment of escrow accounts with the Bank of England and the Central Bank of Algeria, directing the transfer of previously blocked Iranian government assets to those accounts, and nullifying all interests in the assets other than the interests of Iran and its agents, are within the President's authority under the International Emergency Economic Powers Act (IEEPA). Banks and other holders of Iranian assets need not await formal vacation of court-ordered attachments before complying with transfer orders, since they as well as Executive Branch officials are relieved from any liability for actions taken in good faith in reliance on the IEEPA.

Executive order prohibiting the prosecution of any claims against Iran arising from the hostage seizure, and terminating any previously instituted judicial proceedings based on such a claim, is within the President's authority under the IEEPA and the Hostage Act. The order does not purport to preclude any claimant from petitioning Congress for relief in connection with his claim, nor could it constitutionally do so.

Provisions of executive order blocking property of the former Shah's estate and that of his close relatives, and requiring all persons subject to the jurisdiction of the United States to submit to the Secretary of the Treasury information about this property to be made available to the government of Iran, are within the President's authority under the IEEPA. Proposed order also directs the Attorney General to assert in appropriate courts that claims of Iran for recovery of this property are not barred by foreign sovereign immunity or act of state doctrines, and asserts that all Iranian decrees relating to the former Shah and his family should be enforced in courts of the United States.

The President has constitutionally and congressionally conferred authority to enter an agreement designating the Iran-United States Claims Tribunal as the sole forum for determination of claims by the United States or its nationals against Iran, and to confer upon the Tribunal jurisdiction over claims against the United States.

January 19, 1981

THE PRESIDENT

THE WHITE HOUSE

MY DEAR MR. PRESIDENT: I have been asked for my opinion concerning the legality of certain actions designed to resolve issues arising from the detention in Iran of 52 American hostages, including the diplomatic and consular staff in Tehran.

An international agreement has been reached with Iran. The agreement, which consists of four separate documents, commits the United States and Iran to take specified steps to free the hostages and to resolve specified claims between the United States and its nationals and Iran and its nationals. These documents embody the interdependent

commitments made by the two parties for which Algeria has been acting as intermediary.

The first document is captioned "Declaration of the Government of the Democratic and Popular Republic of Algeria" (Declaration). The Declaration provides, first, for non-intervention by the United States in the internal political and military affairs of Iran.

Second, the Declaration provides generally for return of Iranian assets. The transfer utilizes the Central Bank of Algeria as escrow agent and the Bank of England in London as depositary: their obligations and powers are specified in two other documents, the "Escrow Agreement" and the "Depositary Agreement." Separate timetables and conditions are described for assets in the Federal Reserve Bank of New York (Fed), in foreign branches of United States banks, and in domestic branches of United States banks, and for other financial assets and other property located in the United States and abroad. The transfer of the assets in the Fed and in the foreign branches to the Bank of England is scheduled to take place first. Upon Iran's release of the hostages, the Central Bank of Algeria, as escrow agent, shall direct the Bank of England, under the terms of the Escrow and Depositary Agreements, to disburse the escrow account in accordance with the undertakings of the United States and Iran with respect to the Declaration.

The transfer from the Central Bank of Algeria to Iran of the assets presently in the domestic branches will take place upon Iran's establishment with the Central Bank of Algeria of a Security Account to be used for the purpose of paying claims against Iran in accordance with a Claims Settlement Agreement set forth in the fourth document, which is captioned "Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran" (Claims Settlement Agreement). The Claims Settlement Agreement provides for the establishment of an Iran-United States Claims Tribunal, which will have jurisdiction to decide three categories of claims: (1) claims by United States nationals against Iran and claims by Iranian nationals against the United States, and counterclaims arising out of the same transaction or occurrence, for claims and counterclaims outstanding on the date of the Agreement; [1] (2) Official claims of the governments of the United States and Iran against each other arising out of contracts for the purchase and sale of goods and services; and (3) any dispute as to the interpretation or performance of any provision of the Declaration.

---

[1] Two categories of claims are specifically excluded: (1) claims relating to the seizure or detention of the hostages, injury to United States property or property within the compound of the embassy in Tehran, and injury to persons or property as a result of actions in the course of the Islamic Revolution in Iran which were not actions of the government of Iran and (2) claims arising under the terms of a binding contract specifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts.

Third, the Declaration provides for nullification of trade sanctions against Iran and withdrawal of claims now pending in the International Court of Justice. The United States also agrees not to prosecute its claims and to preclude prosecution by a United States national or in the United States courts of claims arising out of the seizure of the embassy and excluded by the Claims Settlement Agreement.

Fourth, the Declaration provides for actions by the United States designed to help effectuate the return to Iran of the assets of the family of the former Shah.

A series of executive orders has been proposed to carry out the domestic, and some foreign, aspects of the international agreement. It is my opinion that under the Constitution, treaties, and laws of the United States you, your subordinates, the Fed, and the Federal Reserve Board are authorized to take the actions described in the four documents constituting the international agreement and in the executive orders.[2]

I shall first examine the proposed executive orders and consider them as to form and legality. Subsequently I shall consider certain questions which arise from other proposed actions and documents related thereto.

1. The first proposed executive order is captioned "Direction Relating to Establishment of Escrow Accounts." Under it, the Secretary of the Treasury is authorized to direct the establishment of an appropriate escrow agreement with the Bank of England and with the Central Bank of Algeria to provide as necessary for distribution of funds in connection with the release of the hostages. The Escrow Agreement provides, among other things, that certain assets in which Iran has an interest shall be credited by the Bank of England to an escrow account in the name of the Central Bank of Algeria and transferred to Iran after the Central Bank of Algeria receives certification from the Algerian government that the 52 hostages have safely departed from Iran.

The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (Supp. I 1977), provides you with authority, during a declared national emergency, to direct transactions and transfers of property in which a foreign country has an interest under such regulations as you may prescribe. As the proposed order recites, such an emergency has been declared. IEEPA was the authority for the blocking order of November 14, 1979, Executive Order No. 12,170, which asserted control over Iranian government assets. Moreover, the statute known as the Hostage Act, 22 U.S.C. § 1732, authorizes the President, when American citizens are unjustly deprived of liberty by a foreign government, to use such means, not amounting to acts of war, as he may think "necessary and proper" to bring about their release. The phrase "necessary and proper" is, of course, borrowed from the Constitution, and has been construed as providing very broad discre-

---

[2] Documents testifying to the adherence to the agreement by both the United States and Iran will also be executed; these documents present no substantive legal issues.

tionary powers for legitimate ends. U.S. Const. Art. I, § 8, cl. 18; *McCulloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316 (1819). Establishment of the escrow account is directed to the release of the hostages. This order thus falls within your powers under these Acts.[3]

It is approved as to form and legality.

2. The second proposed executive order is captioned "Direction to Transfer Iranian Government Assets." The Fed is directed to transfer to its account at the Bank of England, and then to the escrow account referred to in paragraph 1, the assets of the government of Iran, as directed by the Secretary of the Treasury. The order also revokes the authorization for, and nullifies all interests in, the frozen Iranian government property except the interests of Iran and its agents. The effect of this order will be to void the rights of plaintiffs in any possible litigation to enforce certain attachments and other prejudgment remedies that were issued against the blocked assets following the original blocking order.

I believe that this provision is lawful for several reasons. I am informed, first, that the Iranian funds on deposit in the Fed are funds of the Bank Markazi, the Central Bank of Iran. As such, they are clearly not subject to attachment. The Foreign Sovereign Immunities Act of 1976 specifically states that the property of a foreign central bank held for its own account shall be immune from attachment and execution unless that immunity has been explicitly waived. 28 U.S.C. § 1611(b). It is my view that there has been no such waiver.

Even assuming, *arguendo,* that the attachments are not precluded by 28 U.S.C. § 1611(b), there is power under IEEPA to nullify them or to prevent the exercise of any right under them. Under IEEPA, the President has authority in time of emergency to prevent the acquisition of interests in foreign property and to nullify new interests that are acquired through ongoing transactions. The original blocking order delegated this power to the Secretary of the Treasury, who promulgated regulations prohibiting the acquisition, through attachment or any other court process, of any new interest in the blocked property. The effect of these regulations was to modify both the substantive and the procedural law governing the availability of prejudgment remedies to creditors of Iran. The regulations contemplated that provisional remedies might be permitted at a later date but provided that any unauthorized remedy would be "null and void." 31 C.F.R. § 535.203(e).

Subsequently, all of the attachments and all of the other court orders against the Iranian assets held by the Fed were entered pursuant to a general license or authorization given by the Secretary of the Treasury effective November 23, 1979. This authorization, like all authorizations issued under the blocking regulations, may be revoked at any time in

---

[3] Although I do not specifically discuss the applicability of the Hostage Act to the other proposed orders described in this opinion, I believe that it generally supports their issuance.

accordance with 31 C.F.R. § 535.805, which expressly provides that any authorization issued under the blocking order could be "amended, modified, or revoked at any time." *See Orvis* v. *Brownell,* 345 U.S. 183 (1953). The regulations did not purport to authorize any transaction to the extent that it was prohibited by any other law (other than IEEPA), such as the Foreign Sovereign Immunities Act.[4] 31 C.F.R. § 535.101(b).

Upon revocation, the exercise or prosecution of any interests created by the outstanding attachments and other orders will be unauthorized. The orders themselves will no longer confer any enforceable right upon the creditors. Indeed, because IEEPA expressly grants to the President a power of nullification, the interests created by these provisional remedies are themselves subject to nullification, in addition to nullification by the revocation of the underlying authorization. In this respect the President's power under IEEPA is analogous to his constitutional power to enter into international agreements that terminate provisional interests in foreign property acquired through domestic litigation if necessary in the conduct of foreign affairs. *See The Schooner Peggy,* 5 U.S. (1 Cranch) 103 (1801). The nullification of these interests is an appropriate exercise of the President's traditional power to settle international claims. *United States* v. *Pink,* 315 U.S. 203 (1942); *United States* v. *Belmont,* 301 U.S. 325 (1937).

Upon the direction of the Secretary of the Treasury, the Fed will be free to transfer the Iranian assets; the attachments and other prejudgment encumbrances will have been rendered unenforceable by the contemporaneous change in law. Moreover, the Fed may comply with the Secretary's directive without litigating in advance the issue of the Secretary's authority to nullify the provisional interests. IEEPA explicitly states, and the proposed order affirms, that "[n]o person shall be held liable in any court . . . for anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, [IEEPA] or any regulation, instruction, or direction issued under [IEEPA]." 50 U.S.C. § 1702(a)(3). I believe that Congress intended this provision to relieve holders of foreign property, as well as individuals administering or carrying out orders issued pursuant to IEEPA, from any liability for actions taken in good faith in reliance on IEEPA and presidential directives issued under IEEPA. This provision protects not only the Fed and the Federal Reserve Board but Executive Branch officials as well. In my opinion, this provision is valid and effective for that purpose.

---

[4] In *New England Merchants National Bank* v. *Iran Power Generation and Transmission Co.,* 502 F. Supp. 120 (S.D.N.Y. 1980), the district court took the position that the freeze order under IEEPA took precedence over the Foreign Sovereign Immunities Act, thus removing Iran's immunity. Assuming, *arguendo,* the correctness of that position, the legal effect of the totality of actions discussed herein would be to reinstate Iran's immunity, thereby removing the *ratio decedendi* of the district court's decision.

Similarly, the Secretary himself is empowered, in my opinion, to nullify these provisional interests and to license the transfer of the assets without submitting the issue to litigation and without insisting that the Fed refuse any transfer until all objections to the transfer have been definitively rejected by the courts. As noted, the interests, if any, created by these prejudgment remedies were created upon the condition that the authority for the underlying transactions might be revoked "at any time"; and that condition may be invoked without delay. The powers that the Constitution gives and the Congress has given the President to resolve this kind of crisis could be rendered totally ineffective if they could not be exercised expeditiously to meet opportunities as they arise. The primary implication of an emergency power is that it should be effective to deal with a national emergency successfully. *United States* v. *Yoshida International, Inc.,* 526 F.2d 560, 573 (C.C.P.A. 1975).

Moreover, the Fed may transfer the assets before the outstanding court orders have been formally vacated. When a supervening legislative act expressly authorizes a course of conduct forbidden by an outstanding judicial order, the new legislation need not require the persons subject to it to submit the matter to litigation before pursuing the newly authorized course. *See Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421 (1855). I believe that this case is closely on point. A valid executive order has the force of a federal statute, superseding state actions to the extent that it is inconsistent. *Contractors Association of Eastern Pennsylvania* v. *Secretary of Labor,* 442 F.2d 159, 166 (3d Cir.), *cert. denied,* 404 U.S. 854 (1971). Thus, the holding of the *Wheeling* case applies here.

The order is approved as to form and legality, and actions taken consistent with and pursuant to it will be lawful and valid.

3. The third proposed executive order is captioned "Direction to Transfer Iranian Government Assets Overseas." In general, it directs branches of United States banks outside the country to transfer Iranian government funds and property to the account of the Fed in the Bank of England. The transfer is to include interest at commercially reasonable rates from the date of the blocking order. The Secretary of the Treasury shall determine when the transfers shall take place. Any banking institution that executed a set-off against Iranian funds after entry of the blocking order is directed to cancel the set-off and to transfer the funds in the same manner as the other overseas deposits.

The Iranian funds in the branches of American banks overseas were subject to the November 1979 blocking order. Subsequently the Secretary of the Treasury licensed foreign branches and subsidiaries of American banks to set off their claims against Iran or Iranian entities by debit to the blocked accounts held by them for Iran or Iranian entities. 31 C.F.R. §535.902. As a result of this license, American banks with

branches overseas set off various debts owing to them by Iran and Iranian entities. I understand that most of the debts were loans originally made from offices in the United States and that most of the overseas deposits were in branches located in the United Kingdom. The banks with overseas Iranian accounts set off amounts owing not only to them directly but to other banks with whom they were participants in syndicated loans. The banks have acted on the assumption that any loan made to Iran or an Iranian entity could be set off against any account of Iran or an Iranian entity or enterprise on the theory that, as a result of the control of the Iranian economy by the government of Iran and nationalization of private enterprises, all such entities and enterprises were the same party for purpose of setting off debts. In addition, the banks accelerated the amounts due on loans that were in default, and, under the doctrine of anticipatory breach, set off loans that had not come due.

The blocking order delegated to the Secretary of the Treasury the authority to license the set-offs to the extent that the executive order prevented them. The license did not, however, determine whether the set-offs were valid under any other law. 31 C.F.R. § 535.101(b). I understand that Iran and its entities are contesting in litigation overseas whether the set-offs are lawful. The issues include the proper situs of the debts, identity of the parties, the propriety of acceleration, and the anticipation of breach.

IEEPA authorizes the President, under such regulations as he may prescribe, to nullify and void *transactions* involving property in which a foreign country has an interest and to nullify and void any *right* respecting property in which a foreign country has an interest. 50 U.S.C. § 1702. Either analysis is appropriate here: Iran had an interest in the original set-off transaction and continues to have an interest both in the amounts in the accounts which have and have not been set off. The latter, as noted, are the subject of litigation abroad. *See* 31 C.F.R. §§ 535.311–312. *Cf. Behring International* v. *Miller,* 504 F. Supp. 552 (D.N.J. 1980) (holding that Iran continues to have interest in a trust account created to pay debt). The very use of the words "nullify" and "void" persuades me that Congress intended to authorize the President to set aside preexisting transactions.[5]

As noted, the order also requires the overseas banks, when transferring the Iranian assets, to include interest on those assets from November 14, 1979, at commercially reasonable rates. I understand that in most cases the accounts in overseas branches of American banks are interest-bearing. To the extent that they are not, such interest represents

---

[5] I believe that the present case is distinguishable in several respects from that in *Brownell* v. *National City Bank,* 131 F. Supp. 60 (S.D.N.Y. 1955). There, the district court concluded that the mere revocation of a license did not serve to void a preexisting and apparently uncontested set-off; the bank, moreover, had no opportunity to recoup its potential loss by bringing the loan current.

the benefit realized by the banks from holding the blocked Iranian assets which, under the law of restitution, should accrue to the owners of the assets. *Cf. Phillips Petroleum Co.* v. *Adams,* 513 F.2d 355 (5th Cir.), *cert. denied,* 423 U.S. 930 (1975). As such, the interest or benefit realized by the banks is property in which Iran has an interest.[6]

For these reasons, I believe that you are thus authorized under IEEPA to compel the transfer of both principal and interest to the Federal Reserve account at the Bank of England as provided by the order and to nullify or prevent the exercise of any interests in this property by anyone other than Iran. I also believe, as discussed in paragraph 2 above, that 50 U.S.C. § 1702(a)(3) relieves from liability anyone taking action in good faith under this executive order.[7]

The proposed order is approved as to form and legality, and actions taken consistent with and pursuant to it will be lawful and valid.

4. The fourth proposed executive order is captioned "Direction to Transfer Iranian Government Assets Held by Domestic Banks." The proposed order directs American banks in the United States with Iranian deposits to transfer them, including interest from the date of blocking at commercially reasonable rates, to the Fed, which will hold the funds subject to the direction of the Secretary of the Treasury.

As discussed in paragraphs 2 and 3, the President has power under IEEPA to direct the transfer of funds of Iran, including interest, and to nullify or prevent the exercise of any interests of anyone other than Iran in Iranian property. Actions taken in good faith pursuant to this order will be, as discussed above, immune from liability.

The order is approved as to form and legality, and actions taken consistent with and pursuant to it will be lawful and valid.

5. The fifth proposed executive order is captioned "Direction to Transfer Iranian Government Financial Assets Held by Non-Banking Institutions." This order is similar to the order described in paragraph 4 except that it requires the transfer to the Fed of funds and securities held by non-banking institutions. The President has the power to direct the transfer of funds and securities of Iran held by non-banking institutions, and actions taken in good faith pursuant to this order shall likewise enjoy the immunity from liability as reflected in 50 U.S.C. § 1702(a)(3).

The proposed order is approved as to form and legality, and actions taken consistent with and pursuant to it will be lawful and valid.

---

[6] *See also* Art. VII(2)(b) of the Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955, United States-Iran, 8 U.S.T. 901, 905, T.I.A.S. No. 3853.

[7] *Cf. Cities Service Co.* v. *McGrath,* 342 U.S. 330, 334–36 (1952). It is my opinion that a person who has taken action in compliance with this executive order and is subsequently finally required by any court to pay amounts with respect to funds transferred pursuant to this executive order will have the right as a matter of due process to recover such amount from the United States to the extent of any double liability.

6. The sixth proposed executive order is captioned "Direction to Transfer Certain Iranian Government Assets." The order would require anyone in possession or control of property owned by Iran, not including funds and securities, to transfer the property as directed by the Iranian government. The order recites that it does not relieve persons subject to it from existing legal requirements other than those based on IEEPA. It does, however, nullify outstanding attachments and court orders in the same manner as does the order discussed in paragraph 2.

For the reasons discussed in the preceding paragraphs, the President has power under IEEPA to order the transfer of property owned by Iran as directed by Iran and to nullify outstanding attachments and court orders related to such property. Actions taken in good faith pursuant to this order shall likewise enjoy the immunity from liability as reflected in 50 U.S.C. § 1702(a)(3).

The order is approved as to form and legality, and actions taken consistent with and pursuant to it will be lawful and valid.

7. The seventh proposed executive order is captioned "Revocation of Prohibitions against Transactions Involving Iran." It revokes the prohibitions of Executive Order No. 12,205 of April 7, 1980; Executive Order No. 12,211 of April 17, 1980; and Proclamation 4702 of November 12, 1979. The two executive orders limited trade with and travel to Iran. The proclamation restricted oil imports from Iran. It is my understanding that although the prohibitions are revoked, the underlying declarations of emergency remain in effect.

The order is approved as to form and legality.

8. The eighth proposed executive order is captioned "Non-Prosecution of Claims of Hostages and for Actions at the United States Embassy and Elsewhere." The order directs the Secretary of the Treasury to promulgate regulations prohibiting persons subject to U.S. jurisdiction from prosecuting in any court or elsewhere any claim against Iran arising from the hostage seizure on November 4, 1979, and the occupation of the embassy in Tehran, and also terminating any previously instituted judicial proceedings based upon such claims.

The President has the power under IEEPA and the Hostage Act to take steps in aid of his constitutional authority [8] to settle claims of the United States or its nationals against a foreign government.[9] Thus, he has the right to license litigation involving property in which a foreign national has an interest, as described in paragraph 2. That license can be suspended by the Executive acting alone. *New England Merchants National Bank* v. *Iran Power Generation and Transmission Co.,* 508 F. Supp. 47 (S.D.N.Y., 1980) (Duffy, J.). *But see National Airmotive Corp.* v.

---

[8] *See, e.g.,* Restatement (Second) of Foreign Relations Law of the United States § 213 (1965).
[9] IEEPA was drafted and enacted with the explicit recognition that the blocking of assets could be directly related to a later claims settlement. H. R. Rep. No. 459, 95th Cong., 1st Sess. 17 (1977); S. Rep. No. 466, 95th Cong., 1st Sess. 6 (1977). *See* 50 U.S.C. § 1706(a)(1) (authorizing continuation of controls, after the emergency has ended, where necessary for claims settlement purposes).

*Government and State of Iran,* 499 F. Supp. 401 (D.D.C., 1980) (Greene, J.).[10]

The order is approved as to form and legality.

9. The final proposed executive order is captioned "Restrictions on the Transfer of Property of the Former Shah of Iran." It invokes the blocking powers of IEEPA to prevent transfer of property located in the United States and controlled by the Shah's estate or by any close relative until litigation surrounding the estate is terminated. The order also invokes the reporting provisions of IEEPA, 50 U.S.C. § 1702(a)(2), to require all persons subject to the jurisdiction of the United States to submit to the Secretary of the Treasury information about this property to be made available to the government of Iran. The property involved is property in which "[a] foreign country or a national thereof" has an interest. Restrictions on transfer and reporting requirements therefore fall within the authority provided by IEEPA.

The order would further direct me, as Attorney General, to assert in appropriate courts that claims of Iran for recovery of this property are not barred by principles of sovereign immunity or the act of state doctrine. I have previously communicated to you and to the Department of State my view to this effect (based on advice furnished to me by the Office of Legal Counsel and the Civil Division of this Department) and will so assert in appropriate proceedings. The proposed order also recites that it is the position of the United States that all Iranian decrees relating to the assets of the former Shah and his family should be enforced in our courts in accordance with United States law.

The proposed order is approved as to form and legality.

10. The other questions relate to the Claims Settlement Agreement. I conclude that you have the authority to enter an agreement designating the Iran-United States Claims Tribunal as the sole forum for determination of claims by United States nationals or by the United States itself against Iran and to confer upon the Tribunal jurisdiction over claims against the United States, including both official contract claims and disputes arising under the Declaration.

The authority to agree to the establishment of the Tribunal as an initial matter cannot be challenged. The Claims Settlement Agreement falls squarely within powers granted to the Executive by the Constitution, by treaty, and by statute.

As a step in the reestablishment of diplomatic relations with Iran, the Claims Settlement Agreement represents an appropriate exercise of the President's powers under Article II of the Constitution to conduct foreign relations. Moreover, by Article XXI(2) of the 1957 Treaty with

---

[10] I note that the issue of appropriate compensation for the hostages will be considered by a Commission on Hostage Compensation established by separate executive order. Moreover, this eighth order does not, of course, purport to preclude any claimant from presenting his claim to Congress and petitioning for relief; nor could it constitutionally do so.

Iran, the Senate gave its agreement for the two nations to settle disputes as to the interpretation or application of the treaty by submission to the International Court of Justice or by any "pacific means."[11] Arbitration by the Iran-United States Claims Tribunal is a pacific means of dispute settlement. Finally, by the Hostage Act, 22 U.S.C. § 1732, Congress has conferred upon the President specific statutory powers applicable to this crisis. The agreement to resolve by arbitration the disputes now obstructing the release of the hostages is a proper exercise of this power.

I note in conclusion the congruence of your constitutional powers and the congressionally conferred authority. In this situation, of course, your authority is at its maximum. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–36 (1952) (Jackson, J., concurring).

The specific jurisdiction conferred upon the Tribunal must be further examined. The first category of claims, the private claims based on debts, contracts, expropriations, or other measures affecting property rights, includes both claims by United States nationals against Iran and claims by Iranian nationals against the United States. The former are referrable to the Tribunal under the constitutional authority to settle claims recognized in *United States* v. *Pink,* 315 U.S. 203 (1942), and *United States* v. *Belmont,* 301 U.S. 324 (1937). *See also* Restatement (Second) of Foreign Relations Law of the United States § 213 (1965).[12]

From these claims are excluded claims arising out of the seizure of the embassy and claims on binding contracts providing for dispute resolution solely by Iranian courts. Again, the power to settle claims includes the power to exclude certain claims from the settlement process. *Cf. Aris Gloves, Inc.* v. *United States,* 420 F.2d 1386 (Ct. Cl. 1970). Moreover, the exclusion is not intended to be a final settlement or determination of these claims. I understand that the claims based on the seizure will be given separate consideration, *see* note 10 *supra.* I note also that the exclusion of the claims on binding contracts that provide the exclusive procedure for dispute resolution does not adversely affect any option that these claimants would have had prior to the hostage crisis and all the actions taken in response to it. These claimants are not disadvantaged by the Claims Settlement Agreement; as to them, the status quo as of the time that the hostages were taken is merely preserved.

---

[11] Art. XXI(2) provides:
> Any dispute between the High Contracting Parties as to the interpretation or application of the present Treaty, not satisfactorily adjusted by diplomacy, shall be submitted to the International Court of Justice, unless the High Contracting Parties agree to settlement by some other pacific means.

Because the Treaty provides for peace and friendship between the two nations, trade and commercial freedom, protection and security of nationals, prompt and just compensation for the taking of property, and the absence of restrictions on the transfer of funds, the disputes to be referred to the Tribunal are disputes "as to the interpretation or application of the . . . Treaty."

[12] Here again, your constitutional powers are supplemented by statute. *See* note 9 *supra.*

The latter claims in the first category, the claims by Iranian nationals against the United States, and also the official claims in the second category by Iran against the United States, are referrable to the Tribunal for adjudication under the same authority. The President's power to refer these claims to binding arbitration as part of an overall settlement of our disputes with Iran is within the authority conferred on him by the Treaty and the Hostage Act and is also within his sole authority under Article II of the Constitution. Any award made by the Tribunal against the United States would create an obligation under international law. Such obligations have invariably been honored by the Congress in our constitutional system.

The remainder of the claims in this second category are official claims of the United States against Iran. The submission of the claims to the Tribunal is a matter for the Executive's sole determination in the conduct of foreign relations.

Finally, jurisdiction over the third category of claims, consisting of disputes as to the interpretation or performance of the Declaration, is appropriately conferred upon the Tribunal incident to the exercise of the power to agree to the Declaration in the first instance.

For these reasons, I conclude that the United States may enter into the international agreement and that you have legal authority to issue all of these documents and executive orders.

Respectfully,

BENJAMIN R. CIVILETTI